SEARS, ROEBUCK AND CO.

v.

JARDEL CO., Inc., Appellant,

v.

HIRSCH, ARKIN, PINEHURST, INC., a Penna. Corp., and Rudolph Guisti.

No. 17753.

United States Court of Appeals Third Circuit.

Argued Sept. 26, 1969.

Decided Jan. 30, 1970.

Rehearing Denied March 6, 1970.

Tom P. Monteverde, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa. (Alfred M. Isaacs, Clair J. Killoran, Flanzer & Isaacs, Killoran & VanBrunt, Wilmington, Del., on the brief), for appellant.

David T. Dana, III, Richard, Layton & Finger, Wilmington, Del. (Edmund N. Carpenter, II, Wilmington, Del., on the brief), for appellee.

Before HASTIE, Chief Judge, and and McLAUGHLIN and VAN DUSEN, Circuit Judges.

## OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

This is an appeal from a District Court order entering summary judgment for the third-party defendant, Hirsch, Arkin, Pinehurst, Inc.

John A. Robbins Co., Inc. (Robbins, Inc.) is a Pennsylvania general construction corporation, wholly owned by John A. Robbins (Robbins) and his wife. In 1958 Robbins, Inc. formed Jardel Co., Inc. (Jardel), the appellant in this action, as a wholly owned Delaware subsidiary with principal offices in Pennsylvania. Robbins has at all times been the president and controlling figure in both corporations.

In 1962 Jardel began the development of Price's Corner Shopping Center on land it owned in Delaware. Jardel hired Robbins, Inc. as general contractor under a contract that prevented Robbins, Inc.,

and apparently its subcontractors, from securing a lien against Jardel's property, thus protecting the mortgagee's interest. Robbins, Inc. in turn subcontracted the plumbing, heating and air-conditioning work to Hirsch, Arkin, Pinehurst, Inc. (Hirsch), a Pennsylvania corporation and appellee in this action. Hirsch agreed to payment on a time and material basis, plus fixed fee.

When Hirsch completed its portion of the construction in the fall of 1963, it was still owed approximately $70,000. by Robbins, Inc. Robbins, Inc. refused to pay, demanding that Hirsch rectify certain errors in the construction. Hirsch made several attempts to correct the problems, but, feeling that it could not satisfy Robbins, finally instituted negotiations for a settlement. As a result of these negotiations, on January 7, 1964, Hirsch agreed to accept $36,000. in full payment of Robbins, Inc.'s obligation to it, in return for which Robbins, Inc. released Hirsch of all liability arising or to arise out of its Price's Corner contract. Jardel was not a party to the release, nor did it participate as a corporation in the negotiations.

On July 9, 1965, a substantial portion of one of the buildings in Price's Corner Shopping Center collapsed. The tenant, Sears, Roebuck and Co., demanded that Jardel rebuild the destroyed portion of the building, which Jardel did as required by the lease. In addition, Sears sued Jardel for $150,000., alleging that its loss of supplies, payroll and other expenses, equipment and profits was due to Jardel's breach of the construction provisions of the contract under which Sears had agreed to rent the building, as well as to Jardel's breach of its duty of maintenance and to negligence.[1] Jardel then sued Hirsch in a third-party action, alleging that "Hirsch breached its agreement with the contractor and was negligent" in failing to meet the Sears' specifications which had been incorporated into Hirsch's contract with Robbins, Inc. Judgment was asked against Hirsch to cover any judgment that Sears might recover against Jardel.[2]

Hirsch filed an answer generally denying the allegations of the third-party complaint. After interrogatories were answered, it amended its answer to plead the release between it and Robbins, Inc. as an affirmative defense against Jardel's claim "because of the relationship between [Jardel] and [Robbins, Inc.]".[3] After depositions were taken, Hirsch moved for summary judgment.

The District Court granted the motion, holding [4] that (a) the general release was valid to bar Jardel's claim if the release bound Jardel as well as Robbins, Inc., and (b) the release bound Jardel because "justice" required the disregard of the corporate distinction between Jardel and its parent, Robbins, Inc. The appellant, Jardel, challenges both these findings.

It is undisputed that the parties negotiating the release did not specifically mention or consider the leaking pipe causing the collapse of the Sears' building, nor can it be disputed, for the purposes of a motion for summary judgment, that the pipe was not installed in accordance with the contract or that this

---

1. Sears alleged that the collapse was caused by the breaking of a water pipe leading from the building to an outside service island. Specifically, Sears claimed that Jardel, in constructing the building, failed to use thick pipe, soft rather than hard pipe, and "sleeving" where the pipe passed through the building's foundation, all of which were required by contract. Another allegation of breach is not relevant here.

2. Jardel later moved to amend its complaint to include a prayer for $73,000., the cost to Jardel of repairing the building. After ruling that judgment would be entered for Hirsch, the District Court said, " * * * the Court need not consider Jardel's motion * * *."

3. In support of its motion to amend, Hirsch declared that it had learned that Jardel was a wholly-owned subsidiary of Robbins, Inc. only after Jardel's answers to the interrogatories.

4. The District Court opinion is not reported.

breach was the cause of the building's collapse.[5] Because of these facts, Jardel argues that the release would not be binding even against Robbins, Inc.; it argues that there can never be an enforceable accord and satisfaction to claims that neither party discussed or knew existed at the time of settlement.

■ We do not believe that the law of Pennsylvania [6] goes this far. A general release, by its terms discharging a party of "all manner of actions and causes of action, suits, debts, dues, accounts, bonds, covenants, contracts, agreements, judgments, claims and demands whatsoever in law or equity arising or to arise from a contract between the parties," [7] will ordinarily be enforced absent a showing that the parties did not intend what they wrote:

"It is well settled that where the terms of a release and the facts and circumstances existing at the time of its execution indicate the parties had in mind a general settlement of accounts, the release will be given effect according to its terms. * * *"

Brill's Estate, 337 Pa. 525, 528, 12 A.2d 50, 52 (1940); see Cockcroft v. Metropolitan Life Ins. Co., 125 Pa.Super. 293, 299, 189 A. 687, 689 (1937) (dictum).

The facts leading to the release were related in depositions by two of the three principals of Hirsch, and their statements have not been refuted by Jardel. After completing the plumbing, heating and air-conditioning work at the Price's Corner project, Hirsch demanded payment from Robbins, Inc. It was met with a series of alleged defects that Hirsch corrected, while denying that the defects were its responsibility. Hirsch again demanded payment, and again it was met with a different list of defects that, once again, it corrected. Finally, upon once again demanding payment and once again being met with a different list of defects, Hirsch asked to negotiate a settlement. Hirsch's purpose in these negotiations was clear—it wished to terminate its relationship with the

---

5. Hirsch, in its answer, denied that the pipe was not in conformity with the contract specifications and that any fault on its part caused the collapse.

6. Under Klaxon Co. v. Stentor Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), the conflict of laws principles of the forum state, Delaware, must be applied to this action. Delaware follows a strict jurisdiction selection test, looking to the law of the place of contracting to determine the validity and construction of a contract. Lams v. F. H. Smith Co., 6 W.W.Harr. 477, 483, 36 Del. 477, 483, 178 A. 651, 653, 105 A.L.R. 646 (Super. Ct.1935); Pauley Petroleum, Inc. v. Continental Oil Co., 231 A.2d 450, 457 (Del.Ch.1967); Harris v. New York Life Ins. Co., 27 Del.Ch. 170, 177, 33 A.2d 154, 157 (1943), followed in Wilmington Trust Co. v. Pennsylvania Co., 40 Del.Ch. 1, 7, 172 A.2d 63, 66 (Del.1961). Also see, e. g., William Whitman Co. v. Universal Oil Prod. Co., 125 F.Supp. 137, 146 (D. Del.1954); Restatement of Conflict of Laws, § 332(f) (1934). In the instant case, the Jardel-Robbins, Inc. contract, the Robbins, Inc.-Hirsch contract, and the release were all executed in Pennsylvania. The Robbins, Inc.-Hirsch contract specifically provided that Pennsylvania law would govern its interpretation. The release made no provision as to applicable law.

7. The release, in pertinent part, provided: "JOHN A. ROBBINS CO., INC. * * * does hereby remise, release and forever discharge HIRSCH, ARKIN, PINEHURST, INC., its successors and assigns of and from all, and all manner of, actions and causes of action, suits, debts, dues, accounts, bonds, covenants, contracts, agreements, judgments, claims and demands whatsoever in law or equity arising or to arise from a contract between the parties * * * for the performance of plumbing, heating, air-conditioning and ventilation work, in connection with a project known as Price's Corner * * * or arising out of any addendum or oral or written modification or extension of these contracts, which against the said HIRSCH * * *, JOHN A. ROBBINS CO., INC. ever had, now has, or which its successors or assigns, or any of them, hereafter can, shall or may have, for, or by reason of any cause, matter or thing whatsoever, from the beginning of the world to the date of these presents."

Robbins organization completely.[8] The negotiations took place at the office of Robbins, Inc.'s (and Jardel's) attorney in Philadelphia; both parties were represented by counsel. Although it does not appear that the principals of Hirsch were directly involved, both Robbins and Mr. Anglin [9] were present for Robbins, Inc. The principals of Hirsch deposed that it was told to their attorney that if Hirsch signed the release, "at no future time would we even hear the name John A. Robbins." And it was on this basis that they accepted:

> "We wanted to make sure we would not be responsible for anything else when we signed this and accepted the final payment; that we would not be responsible for anything else.

\* \* \* \* \* \*

"[O]ur attorney came out and said, 'Will you accept this? This is what they offer.'

"We said, 'We will accept it on the condition that we are released of all possible claims that come out of it [the Price's Corner project],' and he went back in and apparently, obviously they agreed on it and this is what came out of it."

The release, as signed by Robbins and attested to by the secretary of Robbins, Inc., stated that Robbins, Inc. released all its claims against Hirsch in exchange for $34,000.[10]

 Jardel now seeks to challenge the release by the allegation that Hirsch "failed to disclose" the defects of the piping.[11] Even if it were true that Hirsch knew of the alleged defects,[12]

---

8. Abraham Hirsch's testimony was as follows:
 "Q. What was the purpose which your organization had in mind in obtaining a release from the Robbins organization?
 "A. Just to get our money and get away from this nut.
 "Q. Did you intend that after the release was executed that there would be any further negotiations or further claims?
 "A. It was definitely told to our lawyers that if we signed any release it was on the basis that at no future time were we to even hear the name John A. Robbins, if I can say it that way. We wanted nothing further to do with that man."
 David Hershman's testimony was to the same effect:
 "[W]e wanted to make sure that we weren't going to be pinned against the wall for something we had no responsibility for or anything on the job if he was going to negotiate us out of something like $35,000, which he ended up doing."

9. Mr. Anglin was executive vice president of Robbins, Inc. at the time of the negotiations. Although he was an employee also of Jardel, it is not clear whether he was an officer.

10. Robbins, Inc. owed $70,000. on the contract. It paid Hirsch, under the terms of the release, $36,000.

11. In its brief before this court, Jardel also argued that it was the intention of the parties to release Hirsch only of those claims specifically enumerated in the list presented by Robbins to Hirsch immediately before the negotiations. We find nothing in the record to support this contention. In fact, the only mention of the list came from Hirsch's principals, who asserted that at no time did they consider the list a relevant factor:

 "Q. Was it your intention that this release would release you only from those claims [contained in the list] or from all claims in contact with the job?

 "A. [by Hershman] At the moment I couldn't tell you what the claims were. They were very unimportant as far as we were concerned. As I say, we considered them a smoke screen to stop us from what was directly due us. The release was to get us out of the job completely one hundred per cent. It had nothing to do with the claim as far as we were concerned because the claims were unjust to start off with."

12. Hirsch argues that the mere "averment" by Robbins in his affidavit of these facts does not create a "genuine" issue of fact as contemplated by Rule 56(e) of the Federal Rules of Civil Procedure. Because of our disposition of the underlying dispute, we need not reach this issue.

this fact would not defeat the validity of the general release. Under Pennsylvania law, the only question open to challenge is whether the parties intended the release to be honored according to its terms.[13] There is ample evidence in the record supporting the conclusion that the parties intended so to honor the release, and there is no evidence to the contrary. Since it was Jardel's burden to refute the explicit language of the instrument and the corroborating testimony of the Hirsch principals, and since it made no attempt to do so, summary judgment on this issue, against Jardel, was proper. See, *e. g.*, First Nat'l. Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 289–290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); Doff v. Brunswick Corp., 372 F.2d 801, 805 (9th Cir. 1966), cert. den. 389 U.S. 820, 88 S.Ct. 39, 19 L.Ed.2d 71 (1967); Londeen v. Cordner, 356 F.2d 169, 170 (8th Cir. 1966).

Having correctly found the release to cover the claim involved here as to Robbins, Inc., the District Court held the release binding upon Jardel by disregarding the separate entities of the two corporations. While finding that "some efforts are made at the management level to maintain separate entities,"[14] the court held that disregarding the parent-

subsidiary structure in this case[15] was "necessary to do justice and prevent a serious inequity which would otherwise follow." Jardel argues that the corporate entities should not be disregarded, and that since Jardel was not a party to the release, the release should not bar its present action.

Courts of Pennsylvania and Delaware[16] do not easily pierce the corporate veil. In both states the corporate entity is disregarded only in the rarest of cases:

"The corporate entity or personality will be disregarded only when the entity is used to defeat public convenience, justify wrong, protect fraud or defend crime." Sams v. Redevelopment Auth., 431 Pa. 240, 244, 244 A.2d 779, 781 (1968).

"[The corporate entity may be disregarded] only in the interest of justice, when such matters as fraud, contravention of law or contract, public wrong, or equitable considerations among members of the corporation require it, are involved." Pauley Petroleum, Inc. v. Continental Oil Co., 239 A.2d 629, 633 (Del.1968).

We need not pass on the District Court's conclusion in this case that the corporate distinction between Jardel and Robbins,

---

13. Jardel has cited many cases to support the general proposition that a mistake by one of the parties to a release, such as "to amount to a complete difference between what he supposed he was receiving or giving up and what was in fact received or given up." 1 C.J.S. Accord and Satisfaction § 3(c), at p. 471 (1936), makes the release unenforceable. In this case, however, the only evidence is that the parties bargained for and received a general release, covering all claims having arisen or "to arise," which Robbins, Inc. "ever had, now has, or which * * * [it] hereafter can, shall or may have." By its own terms, therefore, the release covered claims unknown to the parties at the time of execution.

14. Each corporation kept separate books, bank accounts, stationery, and all business between the two corporations and between each of them and others was scru-

pulously carried out by written contract identifying each as a separate party.

15. Robbins and his wife owned 100% of Robbins, Inc. Robbins, Inc. in turn owned 100% of many subsidiary corporations, each of which was formed as a vehicle for different construction projects. All the corporations were managed by a subsidiary management corporation, all shared the same office, and all had the same employees. Robbins was the president of each; Anglin was "second in command" of the overall operation.

16. Although Pennsylvania law governs the interpretation of the contracts, see note 6, *supra*, it is not clear that Pennsylvania law governs the regard to be given the corporate entity. Cf. Restatement of Conflicts of Law §§ 155(1), 157 (1934). As to this issue, there is no conflict between the law of Pennsylvania and Delaware.

Inc. should be disregarded,[17] since we believe the District Court order must be affirmed for another reason.

Even if the corporate veil of Jardel were not disregarded, it cannot entirely separate itself, for the purpose of this suit, from the activities of Robbins, Inc. Jardel's claim against Hirsch is based upon Hirsch's duties arising out of Robbins, Inc.'s subcontract with it. In its third-party complaint, Jardel alleged the contract as the basis for its suit: "Defendant is informed and believes and thereon alleges that Hirsch breached its agreement with the contractor [Robbins, Inc.] * * *." But just as Jardel did not sign the release, so too it was not a signatory to the underlying Robbins, Inc.-Hirsch contract.

■ Because the contract explicitly contemplated the provision of services by Hirsch to Jardel,[18] Jardel has rights under the contract as a third-party creditor beneficiary. See, e. g., Van Cor, Inc. v. American Cas. Co., 417 Pa. 408, 413, 208 A.2d 267, 269 (1965). Professor Williston defines a third-party creditor beneficiary contract as one in which:

" 'no purpose to make a gift appears from the terms of the promise in view of the accompanying circumstances and performance of the promise will satisfy an actual or supposed or asserted duty of the promisee to the beneficiary * * *.'

"The promisee's object in the contract to discharge his debt must always be primarily, and generally solely, to secure his own advantage. He wishes to be relieved from liability, and he exacts a promise to pay the third person only because that is a way of relieving himself."

2 S. Williston, Law of Contracts, § 361, at 863 (3rd Ed., 1959) [quoting Restatement of Contracts § 131(1) (b) (1932)] (footnotes omitted).[19] As general contractor, Robbins, Inc. had a duty to provide Jardel with certain specified services; it chose to fulfill part of that duty by subcontracting with Hirsch, Hirsch thereby promising to complete the plumbing, heating and air-conditioning work. Because courts have "instinctively recogniz[ed] the creditor's [Jardel's] interest in such a promise," Williston, supra, § 361, at 864-65, the third-party creditor beneficiary can sue the promisor (in this case, Hirsch) directly.[20]

17. Cf. Kingston Dry Dock Co. v. Lake Champlain Transp. Co., 31 F.2d 265, 267 (2nd Cir. 1929) (L. Hand, J.):
 "The test is * * * rather in the form than in the substance of the control; in whether it is exercised immediately, or by means of a board of directors and officers, left to their own initiative and responsibility in respect to each transaction as it arises. * * *
 "Perhaps it would be too much to say that a subsidiary can never be liable for a transaction done in the name of the parent * * *. Any person may use another as a screen * * *. But such instances, if possible at all, must be extremely rare * * *."

18. Article I of the Robbins, Inc.-Hirsch contract provided:
 "The word 'Owner' shall mean JARDEL CO., INC., the Owner of the building [or buildings, Art. XXIV] of which the Sub-Contractor's [Hirsch's] work forms a part."

19. Also see 4 A. Corbin, Contracts § 787, at 95 (1951):
 "If the promisee in a contract contemplates the present or future existence of a duty or liability to a third party and enters into the contract with the expressed intent that the performance contracted for is to satisfy and discharge that duty or liability, the third party is a creditor beneficiary."

20. Article XIV of the Robbins, Inc.-Hirsch contract provided that Hirsch "shall indemnify and save harmless the Owner * * * against all claims of damage to persons or property growing out of the execution of [Hirsch's] work." Hirsch also agreed to "indemnify and save harmless" Jardel from any damage arising out of Hirsch's work that could be asserted against the general contractor, Robbins, Inc. The parties' intention that Hirsch's performance was to carry out the obligations of Robbins, Inc. to Jardel also appears in Articles I, II, XVI, XVIII,

■■ Once a third-party beneficiary contract has been made however, the beneficiary's rights are not unlimited.[21] In this case, the terms of § 143 of the Restatement of Contracts require the conclusion that the release satisfied the promisor's obligation to the creditor beneficiary (Jardel) as well as to the promisee (Robbins, Inc.):

"A discharge of the promisor by the promisee in a contract or a variation thereof by them is effective against a creditor beneficiary if,

(a) the creditor beneficiary does not bring suit upon the promise or otherwise materially change his position in reliance thereon before he knows of the discharge or variation, and

(b) the promisee's action is not a fraud on creditors." [22]

Professor Williston has adopted the Restatement rule, distinguishing the creditor beneficiary situation from that of the donee beneficiary,[23] reasoning that the creditor beneficiary's right "is pure-

---

and XXIV. These provisions make clear that " 'both parties to the contract * * * [intended that Jardel be a beneficiary] * * * and * * * [indicated] that intention in the contract * * *.' " See Van Cor, Inc. v. American Cas. Co., *supra*, at 413, 208 A.2d at 269.

21. For example, since the beneficiary's rights depend on the contract, if for some reason the contract is invalid, "no rights can arise in favor of anyone." *Id.* § 364A, at 873; accord, Restatement of Contracts § 140 (1932). See, also, Williston, *supra*, § 395, at 1066. Thus, in Williams v. Paxson Coal Co., 346 Pa. 468, 31 A.2d 69 (1943), a promisor agreed to look only to the dividends of three named shareholders for enforcement of a demand note given him in exchange for the transfer of property to the corporation. After the named shareholders sold their entire interest in the corporation, the promisor sued the corporation to enforce the note. The corporation argued that it was obligated to satisfy the note only if it should declare dividends to the original shareholders. Treating the corporation under its new owners as a donee beneficiary and the original shareholders as promisees to the agreement, the court held that because the promisees had made enforcement of the agreement impossible by removing their names from the shareholder list, there was a failure of consideration by the promisees, and thus the corporation, as third-party beneficiary, could not enforce the agreement.

22. Illustration 1, accompanying § 143, provides:

"B contracts with A to pay C $200 which A owes C. C learns of this con-

tract and expresses satisfaction but does not make a novation with B, or begin an action to enforce a right against B, or change his position in reliance on the contract. Later, in consideration of a horse worth $200 given him by B, A releases B from his contract. C, after learning of the release, cannot enforce a right against B. * * * "

23. The distinction between a creditor and donee beneficiary, restricting the right of the promisor in the donee situation to be released, is based on the theory that only the donee beneficiary (and not the promisee) has so substantial an interest in the contract that he can enforce it. See, *e. g.*, Tasin v. Bastress, 284 Pa. 47, 57, 130 A. 417, 421 (1925). Professor Corbin, however, argues that the creditor beneficiary's rights are similar to those of the donee beneficiary, since the creditor beneficiary is "given" the right to look not only to the promisee for enforcement of his contract, for which he had originally bargained, but also to the promisor. "It seems best, therefore, that the discharge by the promisee should be operative as against the beneficiary only in case he learns of the discharge before he has assented to the contract or has acted in reliance upon it." Corbin, *supra*, note 19, § 815, at 260; see, *e. g.*, Hughes v. Gibbs, 55 Wash.2d 791, 350 P.2d 475 (1960).

The proposed Second Restatement of Contracts, to which Professor Corbin served as Consultant, adopts his view that the promisee and promisor have no power to modify or release the promisor's duties to the beneficiary after the beneficiary has assented to their contract. Restatement (Second) of Contracts § 142 (Tent. Draft No. 3, 1967). However, this tentative draft has been adopted by neither the American Law Institute nor the courts of Pennsylvania.

ly derivative." Williston, *supra,* § 397, at 1074.[24]

■ This is the rule that Pennsylvania would adopt. Not only do Pennsylvania courts rely upon the Restatement and Professor Williston in establishing the law of third-party beneficiary contracts, *e. g.,* Williams v. Paxson Coal Co., 346 Pa. 468, 470, 471, 472, 31 A.2d 69, 70, 71 (1943),[25] but they apparently have adopted § 143. In Clardy v. Barco Construction Co., 205 Pa.Super. 218, 224–225, 208 A.2d 793, 796 (1965), the court found that a release did not bar the third-party creditor beneficiary's claim by reason of § 143, because the creditor had relied on the contract in completing his duties. In Miller v. Travelers Insurance Co., 143 Pa.Super. 270, 17 A.2d 907 (1941), the court adopted the rule of § 143, although it actually cited § 140[26] as authority. Plaintiff's husband contracted with his employer to have deductions taken from his wages to support a group life insurance policy that the employer took out with the defendant insurance company. After giving notice to the employees, the employer cancelled the policy. Upon her husband's death, the plaintiff sued the insurance company as a third-party beneficiary, arguing that the contract between the employer and the insurance company could not have been cancelled without her husband's consent. The court held:

> "The insured employee or his beneficiary have no greater rights than are provided in the policy, certainly no vested right which would prevent cancellation by mutual agreement between the insurer and the employer, especially where reasonable notice of cancellation is given to the employee. A third party beneficiary in an ordinary contract is subject to the limitation of its terms as he has no greater rights under it than are provided in the contract itself: Restatement of the Law, Contracts, § 140 * * *."

*Id.* at 273, 17 A.2d at 908.[27]

Application of § 143 to this case bars not only the recovery by Jardel under a contractual theory, but its suit in negligence as well. Under § 143 the release was also a "variation," expressly precluding "all, and all manner of, actions and causes of action" arising from the

---

24. Also see R. J. Cardinal Co. v. Ritchie, 218 Cal.App.2d 124, 32 Cal.Rptr. 545, 552–553, 561 (1963) ; Davis v. Nelson-Deppe, Inc., 91 Idaho 463, 424 P.2d 733, 737 (1967) ; Britton v. Groom, 373 P.2d 1012, 1015–1016 (Okl.1962) ; Morstain v. Kircher, 190 Minn. 78, 250 N.W. 727 (1933). In commenting on *Morstain,* one student authority relied on § 143: "Since the [creditor beneficiary's] right seems only derivative, * * * it appears better to permit a release if the creditor has not materially changed his position in reliance on the [promisor's] agreement." 47 Harv.L.Rev. 1065, 1066 (1934).

25. Also see note 21, supra.

26. Restatement of Contracts § 140 provides:
 "There can be no donee beneficiary or creditor beneficiary unless a contract has been formed between a promisor and promisee; and if a contract is conditional, voidable, or unenforceable at the time of its formation, or subsequently ceases to be binding in whole or in part because of impossibility, illegality or the present or prospective failure of the promisee to perform a return promise which was the consideration for the promisor's promise, the right of a donee beneficiary or creditor beneficiary under the contract is subject to the same limitation."

27. Another bar to the recovery of the creditor beneficiary occurs in the situation where the promisee recovers a judgment under the contract against the promisor:
 "Whatever the hardship upon the promisor may be in being liable to two persons when he promised but one, most courts have found it the simpler alternative, a recovery by either party being a bar to an action by the other."
 Williston, *supra,* § 392, at 1057 (footnotes omitted) ; *cf.* Parker v. London Guar. & Accident Co., 30 F.2d 464 (E.D. Pa.1927) (federal common law). We need not reach the question whether the rule would be accepted by Pennsylvania or whether it applies to the facts of this case.

contract between Robbins and Hirsch. Pennsylvania courts have uniformly honored such contractual provisions where they are entered into by "free bargaining agents," Galligan v. Arovitch, 421 Pa. 301, 304, 219 A.2d 463, 465 (1966), holding them to bar recovery in tort as well as contract. *E. g.*, Cannon v. Bresch, 307 Pa. 31, 160 A. 595 (1932), cited with approval, Galligan v. Arovitch, *supra*; Dohm v. Ponderosa Riding Stables, 41 Pa.Dist. & Co.R.2d 307 (C. P.York 1966); see Mayo v. McCloskey & Co., 200 F.Supp. 7 (E.D.Pa.1961); Shafer v. Reo Motors, 108 F.Supp. 659 (W.D.Pa.1952), aff'd 205 F.2d 685 (3rd Cir. 1953); Charles Lachman Co. v. Hercules Powder Co., 79 F.Supp. 206 (E.D.Pa.1948).

■ Applying the above-stated rule to Jardel would not work an "injustice," as Jardel has argued.[28] Should Jardel not have an actionable claim against Hirsch, it can still sue the general contractor, Robbins, Inc., whose obligation to Jardel remained unchanged by the subcontract or the release. See, *e. g.*,

National Fire Ins. Co. of Hartford v. Westgate Constr. Co., 227 F.Supp. 835 (D.Del.1964). Indeed, Jardel's separate existence was justified in part by the necessity of keeping its assets apart from those of its parent, and thus suit against its parent would be more than a futile gesture in this instance.[29]

Accordingly, we hold that Jardel is bound by the release, since the record does not show any material change of position by it in reliance on the promise prior to the variation of the contract by the release.[30] See Morstain v. Kircher, 190 Minn. 78, 250 N.W. 727, 728 (1933),[31] where the court said:

" * * * [The plaintiff] paid no consideration for defendant's agreement to pay the mortgage debt, nor had she in reliance on the assumption contract placed herself in a position from which she could not retreat without loss. [citing § 143] * * * "

For the foregoing reasons, the District Court order of December 9, 1968, will be affirmed.

28. Of course, the parties can contract that a release given the promisor shall not be binding on the creditor beneficiary. See Beaver Falls B. & L. Ass'n v. Allemania Fire Ins. Co., 305 Pa. 290, 157 A. 616 (1931).

29. It is irrelevant that Jardel's action against Robbins, Inc. may now be barred by the applicable statute of limitations. It seems reasonable to surmise that Jardel would not have let the statute of limitations run had not Robbins, Inc. been its sole stockholder.

30. In a supplemental brief to this court, Jardel claims that it paid Robbins, Inc. in reliance on the Robbins, Inc.-Hirsch contract, so that Robbins, Inc. could pay Hirsch. Such an allegation, if proved,

might well be a defense to a claim by Hirsch against Jardel for payments owed to Hirsch by Robbins, Inc. Cf. Clardy v. Barco Constr. Co., *supra*. We do not believe, however, that in the posture of this case such a payment represents a material change of position, as contemplated by § 143.
Since Robbins was the president of Jardel when he signed the release on behalf of Robbins, Inc., Jardel simultaneously had knowledge. Jardel did not bring suit on the contract before the release was signed, nor can we find any evidence that Robbins, Inc.'s action in executing the release was a fraud upon its creditors.

31. See, also, Britton v. Groom, *supra*, note 24, 373 P.2d at 1016.