**OLIVER B. CANNON AND SON, INC., a Pennsylvania Corporation, Plaintiff below, Appellant,**

v.

**DORR–OLIVER, INCORPORATED, a Delaware Corporation, et al., Defendants below, Appellees.**

Supreme Court of Delaware.

Argued Dec. 16, 1974.

Decided March 17, 1975.

---

**212**

See also Del.Super., 312 A.2d 322.

Samuel R. Russell and Courtney H. Cummings, Jr., Wilmington, for plaintiff below, appellant.

Richard L. Sutton and Douglas E. Whitney, of Morris, Nichols, Arsht & Tunnell, Wilmington, for appellee Dorr-Oliver, Inc.

James T. McKinstry, of Richards, Layton & Finger, Wilmington, and David L. Grove, of Montgomery, McCracken, Walker & Rhoads, Philadelphia, for appellees Barcroft Co. and William H. Rorer, Inc.

Before DUFFY and McNEILLY, JJ., and WRIGHT, Judge.

DUFFY, Justice:

This appeal is from an order of the Superior Court which fixed liability on appellant, Oliver B. Cannon and Son, Inc. ("Cannon") for certain tank lining failures.

I

After trial without a jury the Superior Court stated its findings and conclusions in an unreported opinion to which reference is made for a full statement of facts.[1]

Cannon was a painting subcontractor employed by the general contractor, Dorr-Oliver, Incorporated ("Dorr"), to perform certain work on chemical process tanks owned by Barcroft Company ("Barcroft") and situated on its premises.

The subcontract between Dorr and Cannon required the latter to prepare and paint interior linings of the pertinent tanks with "Glid-Flake," a substance "recommended" by Cannon. (The precise language used by Cannon in its bid was, "we are offering Glid-Flake."). That work was completed in the latter part of 1969 when some of the tanks were placed in production. In early 1970 failure of various linings became obvious and the basic issue for review is the cause thereof.

The trial evidence identified two possible causes: either Cannon improperly applied the (polyester resin) coating or, although properly applied, the alkaline or caustic nature of the solutions Barcroft used in the tanks caused chemical deterioration (from hydroxyl ion attack) of the Glid-Flake lining.

The Superior Court concluded that Cannon had been guilty of a "multitude of sins" in preparation and application of the

Glid-Flake and that poor workmanship caused the lining failures. A significant basis for its decision was testing done by the United States Testing Company, Inc. (for Dorr) which tended to show that Glid-Flake ". . . if properly applied to a properly prepared surface, and properly cured, is not seriously chemically degraded by the Barcroft products and that a useful life far in excess of one year can be safely predicted."[2] This test data, the Court said ". . . leads inevitably to the conclusion that the massive paint lining failures were due to the poor workmanship of the applicator."

That conclusion was supported by substantial affirmative evidence of Cannon's poor workmanship. The Court itemized no less than ten instances of faulty preparation, careless application and inadequate supervision.

Briefly, then, this is the view of the evidence as it emerges through the opinion of the Superior Court.

II

The critical decisions made by the Trial Judge are, of course, the findings of fact he made as to causation, and the standard of review in testing such findings is well settled in Delaware.

■ In reviewing findings of fact by a trial court sitting without a jury, we look to the record to see if there is sufficient evidence to support those findings. If there is, we must affirm. Fairfield Builders, Inc. v. Vattilana, Del.Supr., 304 A.2d 58 (1973).

■ We have reviewed the record, which was created in twenty trial days; understandably, it is long and complex and

1. See also Oliver B. Cannon and Son, Inc. v. Dorr–Oliver, Inc., Del.Super., 312 A.2d 322 (1973), a pre-trial opinion in which Cannon's motion for summary judgment was denied.

2. A test made by Cannon's expert indicated a contrary conclusion but the Court found that

"the paint lining visualized by Cannon's expert, which he thought he was testing in his brief tests, had properties far different from the actual properties of properly cured Glid-Flake.

reflects the chemical controversy as to causation. In the view we take of the case it is unnecessary to restate that controversy because we conclude that the evidence is sufficient to support the Trial Judge's finding that Cannon's poor workmanship caused the lining failures. That finding is crucial in the case and makes irrelevant much of the dispute about the technical controversy. We must affirm the Court's finding as to causation.

### III

We next consider Cannon's arguments that the chemical nature of the solution to be used by Barcroft was kept (secret) from it, that the solutions had an upper range pH (that is, they were "caustic"),[3] and that a contractual warranty disclaimer as to "Tank Linings for Caustic Solution" insulates it from liability.

As to the concealment issue, the Trial Court found that in January 1969, (before work began the following June), Cannon had "sufficient information," or such information was "readily available," about the chemical nature of the Barcroft process to put it on notice as to the suitability of Glid-Flake lining. Since there is sufficient evidence to support that finding, we must also affirm it. But the Court's basic finding as to causation makes this argument moot because, assuming that the solutions were "caustic" and that Dorr had a duty to inform Cannon of their nature, which it breached, that breach did not proximately cause the lining failures. It was, the Court found, Cannon's workmanship and not causticity that caused the failures. Thus, the lining failures cannot be, in law or fact, a consequence of the alleged breach of duty or condition.[4]

### IV

Cannon argues also that its liability is limited by the contract to "correct or replace" the defective linings and, since the total surface area failure was only twenty percent, it says that 1970 purchase orders which required reblasting and relining of all tanks with a different material ("Carboline") were clearly beyond the scope of the warranty. They were, Cannon continues, a new contract and not merely an undertaking in discharge of its warranty.

The 1970 purchase orders for the relining were executed in a contentious atmosphere in which the parties disputed the reason for the failures of the coating. Barcroft had closed its plant because of the failures and was anxious to resume operation. Through Dorr it requested the relining with Carboline and made a partial payment for that work without prejudice to its rights against Cannon arising from the original warranty. Indeed, the purchase orders, dated October 7, 1970, include a specific reservation of rights resulting from failure of the Glid-Flake lining. We conclude, for several reasons, that the 1970 orders do not have the effect for which Cannon argues:

First, the contractual remedy cannot be read as exclusive of all other remedies since it lacks the requisite expression of exclusivity. See 17 Am.Jur.2d Contracts § 522. Compare Falcon Tankers v. Litton Systems Inc., Del.Super., 300 A. 2d 231 (1972) (construing New York Law). Second, the intention of the parties appears to have been to await a determination as to cause of the failures; if caused by poor workmanship (as the Court eventually found), the relining was to be considered corrective work pursuant to the

---

3. Under Cannon's theory "alkaline" and "caustic" are synonymous terms. There was conflicting expert testimony on this interchangeability.

4. We also note that the intention of the parties apparently was to limit the warranty disclaimer to the Caustic Storage Tank and Two Caustic Dilution Tanks which were lined with a butadiene styrene system and which did not fail.

warranty. Third, a twenty percent failure of the lining area obviously does not necessarily translate into a twenty percent breach; indeed a *de minimus* area failure in some circumstances can deprive a promisee of one hundred percent of what he has bargained for. Here, the record indicates that it was difficult to tell just how much of the area adjoining the obvious failures was also defective. We cannot say that as a matter of law this was an insubstantial breach nor that total relining with a different product was beyond the purview of the "correct or replace" warranty; the extent of the work necessary under that warranty and for which Cannon is responsible must await further findings by the Trial Court after remand.

## V

■ Although the opinion of the Superior Court was primarily devoted to fact-finding and, in its words, ". . . intentionally neglected a review of the complex legal questions raised in the pleadings . . . ," it appears that the Court prospectively settled the law of the case as to liability. This is so in view of the Court's conclusion that:

"Cannon is responsible for all of the paint lining failures because of its poor workmanship and must answer to any parties damaged as a result of such workmanship, both in tort and in the breach of its contract with Dorr-Oliver."

The parties have briefed and argued the applicable law as to liability and the issue is therefore appropriate for decision by this Court.

The Trial Court's adoption of the "language and findings" in the pre-trial decision (312 A.2d at 328) is somewhat ambivalent since these were made in the context of a motion for summary judgment; however, the Court removed any doubt as to its conclusion by stating that Cannon was liable in contract to "any parties damaged" and explicitly clothed Barcroft with third-party-creditor-beneficiary status under the contract.

We agree with the Superior Court's analysis of the law in the earlier opinion and the contract, so far as it goes. The determination of Barcroft's status, of course, hinges on the intention of the parties to the subcontract. 4 *Corbin on Contracts* § 787 (1951). See also cases cited at 312 A.2d 327.

Whether analyzed under the Restatement of Contracts § 133(1)(b), the Restatement (Second) of Contracts § 133 (Tent. Drafts Nos. 1–7, 1973) or 2 *Williston on Contracts* § 361 (1959), we think the subcontract manifests the requisite intent that Cannon's proper performance of the subcontract would, to that extent, discharge Dorr's duty to Barcroft.

We note the substantial similarity of terms between the Cannon-Dorr agreement and the Hirsch-Robbins subcontract in *Sears Roebuck and Co. v. Jardel Co.*, 3 Cir., 421 F.2d 1048 (1970). Both subcontracts define "owner" so as to apprise the promisor that the owner is the ultimate intended beneficiary of the subcontract. The Third Circuit read this definition as explicitly contemplating the provision of services by the subcontractor to the owner, concluding that the latter was a third party beneficiary.

The *Sears* court also placed heavy reliance on the indemnification clause of the subcontract which is markedly similar in language and purpose to Article XXVA of the Cannon-Dorr subcontract.

As pointed out by the Superior Court in its 1973 opinion, several other sections of the Cannon subcontract create rights in Barcroft as owner and, we think, as beneficiary.[5]

---

5. See, e. g., Articles VII ("Risk of Loss"), XI ("Liens"), XXIV ("Rules and Regulations").

The warranty provision of the Cannon/Dorr subcontract further supports this conclusion. It provides that Cannon and Barcroft would share *pro rata* in the costs of repair to the tank linings over the ensuing years, thus:

"a. During the second year of operation and/or use any repairs etc., that become necessary would be handled on a 50%—50% basis.

b. During the third year of operation and/or use any repairs, etc., that become necessary would be at a cost of 75% to our client and 25% to Oliver B. Cannon."

Cannon was like-minded in intention. Its counterstatement of the warranty provision shows that it contemplated ". . . the present or future existence of a duty or liability to a third party . . . ." 4A Corbin on Contracts § 787:

"Any repair work that may become necessary during this initial or first year will be done at no cost to you *or your client*. . . . During the third year of warranty any repairs necessary would be on a 75% cost *to the client* and 25% cost to Cannon basis." (Emphasis supplied.)

The duty to repair, bear a portion of the cost, and inferentially to perform the work properly in the first instance is intended to run primarily to Barcroft, not Dorr. Proper performance thereof would thus satisfy Dorr's duty to Barcroft. Dorr's role as "buffer zone" between Cannon and Barcroft appears extinguished in the context of these provisions and with it, Cannon's contention that it owed no contractual duty to Barcroft.

Our reading of the subcontract convinces us that Barcroft is, and was intended to be a third-party-creditor beneficiary of the contract. We so hold.[6]

\* \* \* \* \* \*

Affirmed and remanded for further proceedings consistent with this opinion.

---

**6.** The decision as to Barcroft's status and its privity of contract obviates the need to consider arguments of the parties relating to Crowell Corporation v. Topkis Construction Co., Del.Super., 280 A.2d 730 (1971). In ruling against the maintenance of a tort action there, the *Crowell* court found no contractual relationship between owner and subcontractor. On remand the parties are free to argue a tortious basis for damages in any way that is not inconsistent with this opinion.