EFiled: Aug 29 2014 12:01PM EDT
Transaction ID 55959055
Case No. 8835-VCN

COURT OF CHANCERY
OF THE
STATE OF DELAWARE

JOHN W. NOBLE
VICE CHANCELLOR

417 SOUTH STATE STREET
DOVER, DELAWARE 19901
TELEPHONE: (302) 739-4397
FACSIMILE: (302) 739-6179

August 29, 2014

Katharine L. Mayer, Esquire
McCarter & English LLP
405 North King Street, 8th Floor
Wilmington, DE 19801

Robert J. Valihura, Jr., Esquire
The Law Office of Robert J. Valihura, Jr.
1203 North Orange Street
Wilmington, DE 19801

Chad J. Toms, Esquire
Whiteford Taylor & Preston LLC
405 North King Street, Suite 500
Wilmington, DE 19801

Brian L. Kasprzak, Esquire
Marks, O'Neill, O'Brien,
 Doherty & Kelly, P.C.
300 Delaware Avenue, Suite 900
Wilmington, DE 19801

Re: *REDUS Peninsula Millsboro, LLC v. Mayer*
C.A. No. 8835-VCN
Date Submitted: March 4, 2014

Dear Counsel:

Defendants/Counterclaim Plaintiffs, Neal M. Mayer, John Gee, Don

Dieringer, David Harrod, John Shanaphy, Marc Stanley, Chuck Burrall, and Deb

Putt (the "Homeowners"), own homes in The Peninsula, a Sussex County

residential development.[1]   In their counterclaims, they challenge the mandatory bundled internet and basic cable services supply agreement that binds their lots with its $90 monthly fee and which may last for many decades, as well as the conduct of the entities benefiting from this contract.   The Homeowners became obligated, through the acquisition of their real estate in the development, to purchase these telecommunications services from the Peninsula Community Association, Inc. ("PCA"), a neighborhood group in which they are required to be members.   PCA purchases those services through Peninsula Infrastructure Management, LLC ("PIM"), which was formed by The Peninsula's original developers to manage the telecommunications services.

The developers of The Peninsula formed PCA before the sale of any lots in the development.   PCA, which was always controlled by the developers, entered into an Agreement to Obtain Communications Services (the "PCA-PIM Agreement") with PIM in 2004.   The PCA-PIM Agreement provided that PIM would manage telecommunications services for PCA for twenty-five years, and that the agreement would automatically renew for four additional ten-year periods,

---

[1] The facts are drawn from the Homeowners' Answer and Counterclaim.

unless PIM decided not to extend the arrangement. In 2005, Verizon Services Corporation ("Verizon") agreed with PIM to provide services to the 1,404 units to be constructed at The Peninsula at a monthly price of $58.95 per unit. Thus, through this arrangement the original developer was able to capture the monthly difference of $31.05 per unit; this payment stream could conceivably be extended to a total term of sixty-five years. The Homeowners assert that employees and directors of the original developer and PCA, at annual PCA meetings, told them on numerous occasions that the $90 fee they were obligated to pay was a "pass through" arrangement.

The original developer encountered financial problems. In 2009, LandTech Receiver Services, LLC and LandTech, Inc. (collectively, "LandTech") were appointed the Receiver to assume control of The Peninsula, at the request of Plaintiff/Counterclaim Defendant Wells Fargo Bank, N.A. ("Wells Fargo"), the principal lienholder of The Peninsula at Longneck LLC. Thereafter, through a foreclosure sale, Wells Fargo obtained certain property and contractual rights at The Peninsula. Plaintiff/Counterclaim Defendant REDUS Peninsula Millsboro LLC ("REDUS"), a wholly owned subsidiary of Wells Fargo, assumed control of

PIM. The Homeowners assert that Verizon also paid PIM, and now pays REDUS, $425 for each residence in The Peninsula which is wired for telecommunications services.

The Homeowners recently learned that the monthly $90 they pay to PIM is not a pass through and sought to adjust the terms of their payments. After the Homeowners wrote to the PCA Board, then directed by LandTech, a Senior Vice President of Wells Fargo responded, on behalf of REDUS and Wells Fargo, that alterations to the PCA-PIM Agreement were unlikely to occur. The Homeowners sought arbitration, which is permitted by the PCA-PIM Agreement, but the arbitration has been stayed in favor of their counterclaims in this proceeding.

The Homeowners, through their counterclaims, seek to invalidate the PCA-PIM Agreement as an unlawful contract, an unconscionable contract, and void against public policy. They also allege that breaches of fiduciary duty committed by the original developers should be imputed to REDUS and Wells Fargo, which have been unjustly enriched as a result of those breaches of fiduciary duty. REDUS and Wells Fargo have moved to dismiss the counterclaims by arguing that

the Homeowners lack standing to challenge the PCA-PIM Agreement and that all

of their claims fail on the merits.

* * *

REDUS and Wells Fargo have moved to dismiss under the familiar standard

of Court of Chancery Rule 12(b)(6), which requires that the Court accept all well-

pleaded facts as true and draw all reasonable inferences in favor of the

Homeowners.[2] Even vague allegations in the counterclaim will be accepted as

well-pleaded if REDUS and Wells Fargo were provided notice of the claim.[3] The

motion to dismiss will be denied if the Homeowners' well-pleaded factual

allegations would entitle them to relief under a reasonably conceivable set of

circumstances.[4] The reasonable conceivability standard asks whether a possibility

of recovery exists. Finally, the Court may reject conclusory allegations that are not

---

[2] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

[3] *Id.*

[4] *Id.* at 537 & n.13.

supported by specific facts, and unreasonable inferences may not be drawn in favor of the Homeowners.[5]

A. *Standing*

REDUS and Wells Fargo contend that the Homeowners lack standing to challenge the PCA-PIM Agreement because they are not parties to the contract and are not creditor or donee beneficiaries of it. They argue that the Homeowners are not donee beneficiaries because they did not have "someone else's performance donated to [them] as a gift secured by the promisee's consideration."[6] They also assert that the Homeowners are not creditor beneficiaries because REDUS and Wells Fargo are not promisees who "owe[] a duty or liability to the beneficiary and [who] secure[d] a contract with another party whose performance satisfies the obligation to the beneficiary."[7]

---

[5] *Price v. E.I. duPont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011) (citing *Clinton v. Enterprise Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)).
[6] *Browne v. Robb*, 583 A.2d 949, 954 (Del. 1990).
[7] *Id.*

However, REDUS and Wells Fargo overlook the principle that "Delaware courts recognize third party standing to sue in contract under the creditor beneficiary theory standard when the promisee owes some legal duty to the third party[.]"[8] Although the *Browne* Court acknowledged that placing third parties into the various categories of beneficiaries can be tricky, here, the Court concludes that the Homeowners' allegation that the prospective lot owners in The Peninsula were the intended beneficiaries of the PCA-PIM Agreement is sufficient for this stage of

---

[8] *Id.* The definition of "duty" is not as limited as REDUS and Wells Fargo suggest. As a guiding principle, "the key to third-party standing in contract law is the intent to benefit the third party." *Amirsaleh v. Bd. of Trade of City of N.Y., Inc.*, 2008 WL 4182998, at *4 (Del. Ch. Sept. 11, 2008). For example, this Court has found third-party standing for membership unit holders where a merger agreement "manifests an unambiguous intent to benefit" the members, such as by paying consideration to them. *Id.; cf. Hadley v. Shaffer*, 2003 WL 21960406, at *5 (D. Del. Aug. 12, 2003)). The Delaware Supreme Court has also found that a property owner can be a third-party beneficiary of a contract between a contractor and a subcontractor where the contract defined the term "owner" and created rights in that owner. *See, e.g., Oliver B. Cannon & Son, Inc. v. Dorr-Oliver, Inc.*, 336 A.2d 211, 215-16 (Del. 1975) (analogizing *Sears Roebuck & Co. v. Jardel Co.*, 421 F.2d 1048 (3d Cir. 1970)). It is appropriate to note that the intricate contractual arrangement here has as its ultimate effect the delivery of internet and cable services to the Homeowners.

the proceedings.[9]   In particular, REDUS and Wells Fargo acknowledge that the PCA-PIM Agreement provides for arbitration of certain claims and thus appears to provide rights to the Homeowners.[10]

REDUS and Wells Fargo also argue that the Homeowners have failed to articulate an injury to a legally protected right or failed to connect this injury to them.  The Homeowners have identified an injury through their allegations of the monetary damages they are suffering.  They have connected this harm to Wells Fargo and REDUS through the acquisition of PIM and through the letter from Wells Fargo's Senior Vice President explaining that the PCA-PIM Agreement

---

[9] Answer and Countercl. ¶ 8.  The "Homeowners" make their entrance early in the script, indeed at the outset of the contract: "The Services provided by the Infrastructure are . . . a customized suite of Services provided at a reasonable cost to Homeowners, and the provision of such Services is in the best interest of the Parties and the Homeowners . . . ."  Aff. of William Emil Honaker in Supp. of Mot. for Prelim. Inj. Ex. B at 1.

[10] Pl.'s Opening Br. in Supp. of Mot. to Dismiss at 8-9 & n.3.  The PCA-PIM Agreement states, "Any Homeowner may challenge the pricing as violating this Section [5.7].  Such Homeowner shall bring an action . . . in accordance with the dispute resolution process described in Section 8.1 below.  If such action is successful, Homeowners shall be entitled to a rebate or credit . . . ."  Aff. of William Emil Honaker in Supp. of Mot. for Prelim. Inj. Ex. B at 9.  Although REDUS and Wells Fargo assert that the Homeowners are beneficiaries *only* of the arbitration provision, they do not explain why the Court should limit the Homeowners' involvement with the PCA-PIM Agreement so strictly.

would not be modified.[11]  The Homeowners' claims will not be dismissed for lack of standing.

B.  *Breach of Fiduciary Duty*

REDUS and Wells Fargo argue that fiduciary duties may only be "imputed to a separate entity formed and controlled by fiduciaries for the purpose of engaging in a transaction with an entity to whom those duties are owed."[12]  They first contend that the original developers owed the Homeowners no fiduciary duties.  Second, they assert that REDUS and Wells Fargo were not formed and controlled by the original developers and therefore fiduciary duties may not be imputed to them.

The Homeowners argue that the breach of fiduciary duty occurred when The Peninsula's developer, which controlled both the homeowner's association and PIM, agreed to the terms of the PCA-PIM Agreement.  They claim that this

---

[11] The letter notes that "the Communications Contracts will continue to be administered by REDUS in accordance with their terms."  Letter to the Court from Robert J. Valihura, Jr., Esquire Opposing Mot. to Expedite Proceedings, Sept. 5, 2013, Ex. B.

[12] *Barbieri v. Swing-N-Slide Corp.*, 1997 WL 55956, at *1 (Del. Ch. Jan. 29, 1997).

transaction, allegedly permitting PIM to capture an additional $31.05 per month

from the lot owners in The Peninsula, permits the fiduciary duties owed by PCA to

the lot owners to be imputed to PIM. The Court agrees. As alleged, the developer

was the controller of the association which would owe duties to its members, the

lot owners, including the Homeowners. The developer caused the incorporation of

PIM, and PIM, as an affiliate of the controller, entered the PCA-PIM Agreement

with PCA, an entity to whom the developers owed fiduciary duties. Thus,

fiduciary duties may be imputed to PIM.

However, the question remains whether REDUS, or Wells Fargo, could be

held responsible under some theory of successor liability. They argue that *Barbieri*

precludes such a result. However, the case does not appear to answer the question

of whether another entity can "step into the shoes" of an entity which may have

breached its fiduciary duties, continue profiting from the breach, and yet avoid

liability for that earlier breach.

Thus, various questions important to the Homeowners' theory of the case

have not been addressed. These questions might include the effect of the

foreclosure sale on whether the imputed fiduciary duty claim may be brought

against REDUS or Wells Fargo, whether some theory of successor liability might cause REDUS or Wells Fargo to be responsible for PIM's alleged breach, and whether the fact that the Homeowners were not members of the homeowner's association at the time the PCA-PIM Agreement was signed has any impact on the scope of the original fiduciary duties owed to them. REDUS and Wells Fargo have not made arguments based upon any of these grounds to which the Homeowners would be entitled to respond. Thus, although the fiduciary duty claim may fail for other reasons, REDUS and Wells Fargo have not moved the Court on those grounds and the claim survives.

C. *Unlawful Contract and Void Against Public Policy Arguments*

REDUS and Wells Fargo contend that the Homeowners have failed to identify how the PIM-PCA Agreement is unlawful or void against public policy. Delaware courts are averse to invalidating agreements on these grounds:

> When parties have ordered their affairs voluntarily through a binding contract, Delaware law is strongly inclined to respect their agreement, and will only interfere upon a strong showing that dishonoring the contract is required to vindicate a public policy interest even stronger than freedom of contract.

> Such public policy interests are not to be lightly found, as the wealth-creating and peace-inducing effects of civil contracts are undercut if citizens cannot rely on the law to enforce their voluntarily-undertaken mutual obligations.[13]

REDUS and Wells Fargo argue that the Federal Communication Commission ("FCC") has authority over such bulk billing arrangements and point to a report stating that such bulk billing arrangements are permissible.[14] And, although the Homeowners correctly assert that the FCC was somewhat troubled by bulk billing arrangements which were "sweetheart deals," the risk of such deals did not cause the FCC to determine that such billing arrangements were impermissible.[15] The Homeowners note that the FCC explained that remedies at state law may allow for rescission of such problematic arrangements. The FCC specifically referred to a collection of state statutes addressing these concerns; however, this list did not identify any Delaware law providing a remedy.[16] The Homeowners fail to identify independently such a policy pronouncement. "The

---

[13] *Libeau v. Fox*, 880 A.2d 1049, 1056-57 (Del. Ch. 2005), *aff'd in part, rev'd in part*, 892 A.2d 1068 (Del. 2006).

[14] *Exclusive Servs. Contracts for Provision of Video Servs. in Multiple Dwelling Units & Other Real Estate Devs.*, 25 F.C.C. Rcd. 2460 (2010).

[15] *Id.* ¶¶ 25, 27.

[16] *Id.* ¶ 27 n.60.

Court will not condemn a contract as a violation of public policy unless the contract clearly contradicts public policy as declared by the legislature,"[17] and thus valid grounds for invalidating the agreement have not been asserted.

The Homeowners also allege that Delaware's policy in favor of the free alienability of property constitutes grounds upon which the PCA-PIM Agreement may be invalidated.[18] However, they fail to identify how this supply agreement unduly burdens their ability to sell their property. Thus, their claims based on public policy will be dismissed.

D. *Unconscionability*

REDUS and Wells Fargo argue that the Homeowners have failed to allege that the PCA-PIM Agreement, an integral part of a complex set of obligation-creating documents that directly and materially affect the Homeowners, is unconscionable as between the parties to the agreement. "[A] contract is unconscionable if it is such as no man in his senses and not under delusion would

---

[17] *Bank of Baltimore v. Auto's Plus*, 1994 WL 19937, at \*2 (Del. Super. Jan. 4, 1994) (citation omitted).
[18] Answer and Countercl. ¶ 65.

make on the one hand, and as no honest or fair man would accept, on the other."[19]

REDUS and Wells Fargo contend that the Homeowners have not alleged that PCA was subjected to an unconscionable agreement. However, the Homeowners have alleged that the payments due under the agreement, borne by the individual homeowners, are unconscionable.[20]

The allegations of several problematic actions concerning the formation of the PCA-PIM Agreement permit an inference that it is unconscionable. The Homeowners allege that they were told that their payments to the homeowner's association were "pass-through" payments and thus the additional $31.05 (monthly per lot) retained by PIM was not disclosed to them. Additionally, the fact that the extra $31.05 is an approximately fifty percent markup of the actual cost of acquiring the communication services creates a question as to whether a reasonable

---

[19] *Tulowitzki v. Atl. Richfield Co.*, 396 A.2d 956, 960 (Del. 1978) (internal quotations omitted).

[20] A party remote from the contracting parties is not necessarily precluded from asserting unconscionability. *See, e.g.*, *Fritz v. Nationwide Mut. Ins. Co.*, 1990 WL 186448, at *5-6 (Del. Ch. Nov. 26, 1990) (granting summary judgment against an insurance contract's enforcement to a third-party beneficiary after finding a compulsory arbitration clause unconscionable), *reargument denied*, 1991 WL 23585 (Del. Ch. Feb. 19, 1991).

person would submit to such an arrangement. Finally, the possibility that the agreement might last for as many as sixty-five years may further inform the analysis of whether the agreement is unconscionable. In short, the combination of the alleged misinformation concerning the creation of the contractual arrangement, the large proportional markup retained by PIM (and now REDUS), and the lengthy term of the agreement create a question as to whether a reasonable person might enter into such an arrangement.

However, the agreement does, under certain circumstances, offer the Homeowners arbitration concerning the price term. To some extent, whether the agreement is reasonable may depend upon whether the price charged to the Homeowners is reasonable, which may be affected by the results of the arbitration which the Homeowners have commenced. The arbitration has been curtailed in favor of these proceedings. However, because the Court's analysis of whether the agreement is reasonable may in part be informed by the payment terms of the agreement, perhaps the arbitration process for resolving payment issues should

move forward.[21]   The Court, accordingly, will convene a conference with counsel to reconsider the advisability of proceeding with the arbitration.

E.  *Unjust Enrichment*

REDUS and Wells Fargo argue the unjust enrichment claim must be dismissed because a valid contract governs the behavior of which the Homeowners complain.  "When the complaint alleges an express, enforceable contract that controls the parties' relationship . . . a claim for unjust enrichment will be dismissed."[22]   REDUS and Wells Fargo correctly cite Delaware law, but ignore that "claims of unjust enrichment may survive a motion to dismiss when the validity of the contract is in doubt or uncertain."[23]   Here, because some uncertainty concerning the validity of the contract exists, the unjust enrichment claim survives.

F.  *The Counterclaims against Wells Fargo*

Finally, Wells Fargo argues that the counterclaims against it should be dismissed because the Homeowners' claims are, in law and in fact, against

---

[21] An understanding of how arbitration views the pricing at least touches upon the alleged unconscionability.

[22] *Bakerman v. Sidney Frank Importing Co., Inc.*, 2006 WL 3927242, at \*18 (Del. Ch. Oct. 10, 2006).

[23] *Id.*

REDUS. Wells Fargo may turn out to be correct, but the Homeowners' allegations describe Wells Fargo's deep involvement with much of the conduct at issue, including its role in transferring to REDUS the rights to PIM and the PCA-PIM Agreement.[24] Thus, dismissal is not warranted under the reasonably conceivable standard.

* * *

For the above reasons, REDUS and Wells Fargo's motion to dismiss the counterclaims is granted as to the Homeowners' counterclaims that the PCA-PIM Agreement is unlawful and void as against public policy. Otherwise, the motion to dismiss is denied.

**IT IS SO ORDERED.**

Very truly yours,

*/s/ John W. Noble*

JWN/cap
cc:    Register in Chancery-K

---

[24] Answer and Countercl. Ex. A.