**PIERCE ASSOCIATES, INC. and Federal Insurance Co., Appellants and Cross–Appellees,**

v.

**The NEMOURS FOUNDATION, Gilbane Building Company, and the Aetna Casualty & Surety Company, Appellees and Cross–Appellants.**

**Nos. 88–3053, 88–3260 and 88–3263.**

United States Court of Appeals, Third Circuit.

Argued Oct. 17, 1988.

Decided Dec. 29, 1988.

As Amended Jan. 6, 1989.

Rehearing and Rehearing In Banc Denied Feb. 3, 1989.

Henry W. Sawyer, III (argued), Drinker, Biddle & Reath, Burt M. Rublin, Wolf, Block, Schorr and Solis–Cohen, Philadel-phia, Pa., for appellant and cross-appellee Pierce Associates, Inc.

Heron, Burchette, Ruckert & Rothwell, Washington, D.C., for appellant and cross-appellee Federal Ins. Co.

George Anthony Smith (argued), Smith, Currie & Hancock, Atlanta, Ga., Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for appellee and cross-appellant The Nemours Foundation.

John Anthony Wolf (argued), Ober, Kaler, Grimes & Shriver, Baltimore, Md., Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, Del., for appellees and cross-appellants Gilbane Building Co. and The Aetna Cas. & Sur. Co.

Before SLOVITER and HUTCHINSON, Circuit Judges, and DEBEVOISE, District Judge *.

OPINION OF THE COURT

DEBEVOISE, District Judge.

### I. *The Parties and the Proceedings*

The Nemours Foundation ("Nemours") owns the Alfred I. duPont Institute Children's Hospital in Wilmington, Delaware. In January 1980 Nemours entered into a general contract with Gilbane Building Company ("Gilbane") for completion of the interior of the Hospital. The Aetna Casualty & Surety Company ("Aetna") became surety on a performance bond which named Gilbane as principal and Nemours as obligee.

Gilbane entered into a number of subcontracts, including a $35.9 million fixed-price subcontract with Pierce Associates, Inc. ("Pierce") pursuant to which Pierce agreed to perform the mechanical work on the project (the heating, ventilation, air-conditioning, plumbing and fire-protection systems). Federal Insurance Company ("Federal") became surety on a performance bond which named Pierce as principal and Gilbane as obligee.

---

* Honorable Dickinson R. Debevoise, United States District Judge for the District of New Jersey, sitting by designation.

Disputes arose about performance under the general contract and under the subcontracts, and complex multi-party litigation ensued. During pretrial proceedings there were various changes in the parties' positions and realignments of adversaries which resulted in a trial at which Nemours and its general contractor Gilbane (joined by its surety Aetna) were plaintiffs seeking damages against Gilbane's subcontractor Pierce and Pierce's surety Federal.

After a 79 day trial the jury found in favor of Nemours and Gilbane on all their claims against Pierce and Federal and found against Pierce on its counterclaims. On September 15, 1986 final judgment was entered awarding $26,017,411 in damages and pre-judgment interest to Nemours and $3,018,372 in damages and pre-judgment interest to Gilbane. The total judgment amount of $29,035,783 was on account of the following items:

*Against Pierce and Federal*

| | |
|---|---|
| For Nemours on account of Pierce's breach of its subcontract with Gilbane and Pierce's negligence and on account of Federal's obligation on its performance bond (plus pre-judgment interest) | $19,045,982 |
| For Gilbane on account of Pierce's breach of the subcontract with it and on account of Federal's obligation on its performance bond | 2,066,699 |
| For Gilbane on account of interest on the award of $2,066,699 at the rate of 13½% from April 18, 1983 to the date of judgment | 951,673 |
| | $22,064,354 |

*For Nemours Against Pierce Only*

| | |
|---|---|
| On certain indemnity claims | $ 3,375,000 |
| Pre-judgment interest on indemnity claims | 1,554,118 |
| Punitive damages | 1,000,000 |
| Attorney's fees and consultant's costs | 1,042,311 |
| | $ 6,971,429 |

After resolution of their post-trial motions for judgment n.o.v. or for a new trial Pierce and Federal filed a notice of appeal from the final judgment on January 26, 1988. Subsequently this Court remanded the case for adjudication of a Rule 60(b) motion which Pierce and Federal had filed challenging the rate of post-judgment interest in the final judgment. The district court granted the motion on April 4, 1988

and reduced the post-judgment interest rate from 10.5% to 5.63%. On April 15, 1988, the district court denied a second Rule 60(b) motion filed by Pierce and Federal which challenged the imposition of post-judgment interest on pre-judgment interest. Nemours, Gilbane and Aetna appeal from the order granting the reduction of post-judgment interest. Pierce and Federal appeal from the order denying the motion for relief from the award of post-judgment interest on pre-judgment interest.[1]

We conclude as follows: (i) The award of $19,045,982 in favor of Nemours against Pierce must be reversed for the reason that Nemours has neither a contract claim nor a negligence claim against Pierce. (ii) The award of $19,045,982 in favor of Nemours against Federal must be reversed for the reason that Federal's liability is dependent upon and derivative of Pierce's liability. (iii) The award of $2,066,699 for contract damages in favor of Gilbane and against Pierce and Federal will be reversed to the extent it represents delay liquidated damages and affirmed to the extent it represents recovery of $269,699 in back charges. (iv) The award of pre-judgment interest on $269,699 in favor of Gilbane and against Pierce will be reversed and remanded for recomputation of interest in accordance with applicable Delaware law. (v) The awards in favor of Nemours and against Pierce on the indemnity claims and interest thereon and for punitive damages, attorneys' fees and consultants' costs will be reversed. (vi) To the extent that they are still applicable, the district court's orders granting Pierce's and Federal's motion to reduce post-judgment interest and denying Pierce's and Federal's motion for relief from the award of post-judgment interest on pre-judgment interest will be affirmed.

The court has jurisdiction under 28 U.S. C. § 1291.

---

1. The district court's order granting Pierce's and Federal's motion to reduce post-judgment interest is the subject of the appeal in Docket No. 88-3260. The district court's order denying Pierce's and Federal's motion for relief from the award of post-judgment interest on pre-judgment interest is the subject of the appeal in Docket No. 88-3263. All other matters under appeal are encompassed in the appeal in Docket No. 88-3053.

## II. *The Background*

These appeals do not challenge the sufficiency of the evidence. Rather, they challenge the legal sufficiency of the claims submitted to the jury and concern legal rulings of the trial court. The facts upon which these rulings were based are not in dispute.

As recited above, in January 1980 Nemours entered into a general contract with Gilbane to complete the interior of its Children's Hospital. This contract includes the American Institute of Architects' "General Conditions of the Contract of Construction" (1976 ed.) (the "AIA General Conditions"). Article 1.1.2 of the AIA General conditions states:

> Nothing contained in the Contract Documents shall create any contractual relationship between the Owner [Nemours] or the Architect and any Subcontractor or Sub-subcontractor.

Gilbane in turn entered into a number of subcontracts. The largest was its $35.9 million fixed-price subcontract with Pierce, executed in June 1980 which called for Pierce to perform the mechanical work on the project. Gilbane entered into other subcontracts including a $19.7 million subcontract with Dynalectric Company ("Dynalectric) for electrical work and an $8.6 million subcontract with Honeywell, Inc. ("Honeywell") for installation of the building management systems.

Section 1 of the Gilbane–Pierce subcontract provided that Pierce would "furnish all materials and perform all work as described in Section 2 hereof for Phase 5B: A.I. duPont Institute for the Nemours Foundation Hospital Building ... all in accordance with the Drawings and Specifications ... and subject in every detail to the supervision and satisfaction of [Gilbane] and of [Nemours] or his duly authorized representative."

The subcontract provided in Section 6 that "[Pierce] agrees to be bound to [Gilbane] by the terms and conditions of this Agreement, the Drawings and Specifications, the General Contract and the General Conditions for construction ..., and to assume toward [Gilbane] all the obligations and responsibilities that [Gilbane], by these documents, assumes toward [Nemours]." The General Conditions, of course, contained the provision that nothing contained in the "Contract Documents" shall create any contractual relationship between Nemours and any subcontractor.

A number of provisions in the subcontract, particularly those found in Section 7, imposed upon Pierce specific obligations vis-a-vis Nemours. For example: Section 7(a) requires Pierce to "furnish Shop Drawings, Erection Drawings, Details, Samples, etc.," for Nemours' approval. Section 7(b) bestowed upon Nemours the right to agree on lump sum pricing of changes to Pierce's work. Section 7(c) gave Nemours the right to inspect and condemn Pierce's work and required Pierce to "make good" the condemned work at its own expense. Section 7(e) required Pierce to "indemnify and save harmless" Nemours from any expenses, liability or loss arising from patent, copyright or trademark infringement.

After the terms of the Gilbane–Pierce subcontract were agreed upon, Gilbane sent it to Nemours for approval. By letter dated September 9, 1980 Nemours approved the subcontract and also stated, "[b]y this approval, The Nemours Foundation does not waive, and expressly reserves all of its rights and remedies under said contract and nothing herein shall be deemed or construed to create any contractual relationship between The Nemours Foundation and said subcontractor." At the foot of the letter Gilbane executed the following: "Receipt and Acceptance acknowledged this 19th day of September, 1980."

Pursuant to the requirements of the subcontract Pierce furnished Gilbane a performance bond naming Pierce as principal, Federal as surety and Gilbane as obligee. Two provisions are pertinent to the present case. The bond provides, "No right of action shall accrue on this bond to or for the use of any person or corporation other than the Obligee named herein or the heirs, executors, administrators or successors of the Obligee." Immediately after that provision there appears the following: "Pro-

vided, however, that this Performance Bond issued on behalf of the named Principal may not be assigned to any party other than the Owner, The Nemours Foundation, without the consent of the Sureties." The bond was never assigned to Nemours.

Gilbane and its subcontractors commenced performance under their respective contracts. Serious delays ensued, the causes of which were the subject of vigorous disagreement. The delays and disputes over contract plans and specifications, design revisions, job progress schedules, progress payments and change orders resulted in Nemours withholding payments. In response, in April 1983 Pierce suspended performance under the subcontract. Although the other subcontractors asserted claims against Gilbane and Nemours, they stayed on the job.

To meet the situation created by Pierce's abandonment of the job, Nemours hired contractors to correct and finish Pierce's work under the direction of Turner Construction Company ("Turner"). Gilbane and its other subcontractors coordinated with Turner and the completion contractors to finish the Hospital. Substantial completion took place by December 1984 twenty-one months late.

Not surprisingly, litigation ensued. It was carried on while the Hospital was being completed and thereafter. On April 5, 1983 Gilbane filed a complaint against Nemours and its architect and engineer alleging breach of contract, breach of warranty and negligence. Gilbane sought compensation for delay damages suffered by it and its subcontractors.

It would appear that at that time Gilbane and certain of its subcontractors, including Pierce, were working in tandem. On the day Gilbane filed its complaint against Nemours, Pierce and the electrical contractor, Dynalectric, filed similar breach of contract actions against Gilbane and its surety, Aetna, seeking compensation for delay, for changed and added work and for monies wrongfully withheld. Honeywell, the

management systems subcontractor, filed a similar complaint against Gilbane sometime later.

In Gilbane's action, counterclaims were filed against it by Nemours and its architect and engineer. In the subcontractors' actions, Gilbane filed counterclaims for indemnification and contribution and also impleaded Nemours and its architect and engineer. Nemours, in turn, filed counterclaims against Gilbane.

Nemours also filed breach of contract and negligence claims directly against Gilbane's subcontractors and their sureties, alleging that it was a third party beneficiary of the subcontracts and of the surety bonds. Pierce and Dynalectric moved to dismiss Nemours' claims against them on the ground that there was no third party beneficiary relationship between Nemours and them, and Nemours could not recover on a negligence theory for purely economic loss. On March 15, 1984 the district court denied the motions.[2] Pierce and Dynalectric then answered Nemours' claims and filed counterclaims against it.

Up to that point and for some time thereafter the positions of Gilbane and its subcontractors, despite the claims asserted against each other, appeared to be in substantial alignment. That is to say, they attributed responsibility for the delays and other difficulties to Nemours and its architect and engineer. In March 1985 Gilbane settled with Nemours and its architect and engineer, joining with them in asserting claims against Pierce. Pursuant to the settlement, Gilbane received $4,025,000, of which Nemours paid $3,375,000, Nemours' architect paid $300,000, and its engineer paid $350,000. Gilbane in turn paid the aggregate sum of $3,669,000 to settle the delay claims asserted by Dynalectric, Honeywell and other smaller subcontractors, retaining $356,000 for itself. The settlement agreement further provided that Gilbane would be entitled to share with Nemours on a 50–50 basis the first $8,000,-000 of any possible recovery from Pierce.

**2.** The district judge who tried the case was assigned to it less than a year before commencement of trial. He was the fourth judge assigned

to the case, and most of the pretrial motions were decided by the preceding judges.

A recital in the settlement agreement stated that the parties to it were of "the strong opinion and belief" that the primary causes of the delays to the completion of the project and of the damages incurred by them were attributable to Pierce's breaches of contract, negligence and, in the opinion of Nemours, fraud on Pierce's part. Gilbane promised in the settlement agreement to cooperate with Nemours in its action against Pierce by forsaking any claim or defense based on Nemours' action, to seek commitments from its subcontractors in their settlement agreements to cooperate with Nemours in a similar fashion, and to refrain from settling with Pierce or Federal without Nemours' written consent.

In order to reflect the realignment of the parties resulting from the settlement, the district court designated Nemours and Gilbane as co-plaintiffs and Pierce and Federal as the defendants. On November 4, 1985 the district court denied Pierce's motion to dismiss Nemours' claim seeking indemnification for the $3,375,000 which Nemours had paid in settlement.

A trial by jury commenced on March 31, 1986. The results are reflected in the final judgment described in Part I above.

### III. *Third Party Beneficiary Claims*

■ It must first be determined whether the district court erred as a matter of law by holding that Nemours was a third party beneficiary of the Gilbane–Pierce subcontract.[3] Since this issue involves only a question of law the standard of review is plenary. This being a diversity of citizenship case brought pursuant to 28 U.S.C. § 1332, this and the other substantive issues are controlled by Delaware law.

"It is well settled in Delaware that a third-party may recover on a contract made for his benefit.... But in order for there to be a third party beneficiary, the contracting parties must intend to confer the benefit." *Ins. Co. of North America v. Waterhouse*, 424 A.2d 675, 679 (Del.Super. 1980). The intent to confer a third party

beneficiary benefit is to be determined from the language of the contract. *Oliver B. Cannon & Sons, Inc. v. Dorr–Oliver, Inc.*, 336 A.2d 211, 215 (Del.1975); *Royal Indemnity Co. v. Alexander Industries, Inc.*, 8 Storey 548, 58 Del. 548, 211 A.2d 919, 920 (1965.)

Thus in the present case an intent to confer third party beneficiary status on Nemours must be gleaned from the language of the Gilbane–Pierce subcontract. The language of a contract, however, cannot be divorced from the context in which it was written. Here, we are dealing with a general contract and a subcontract in the construction industry.

Typically when major construction is involved an owner has neither the desire nor the ability to negotiate with and supervise the multitude of trades and skills required to complete a project. Consequently an owner will engage a general contractor. The general contractor will retain, coordinate and supervise subcontractors. The owner looks to the general contractor, not the subcontractors, both for performance of the total construction project and for any damages or other relief if there is a default in performance. Performance and the payment of damages are normally assured by the bond of a surety on which the general contractor is principal and the owner is the obligee.

The general contractor, in turn, who is responsible for the performance of the subcontractors, has a right of action against any subcontractor which defaults. Performance and payment of damages by a subcontractor are normally assured by the bond of a surety on which the subcontractor is principal and the general contractor is the obligee.

Thus the typical owner is insulated from the subcontractors both during the course of construction and during the pursuit of remedies in the event of a default. Conversely, the subcontractors are insulated from the owner. The owner deals with

---

**3.** The third party beneficiary issue, like the negligence issue, was presented to the trial court in the context of pretrial motions, motions during the trial, objections to the jury charge and post-trial motions.

and, if necessary, sues the general contractor, and the general contractor deals with and, if necessary, sues the subcontractors.

These typical construction contract relationships have long been recognized:

[Contracts between a principal building contractor and subcontractors] are made to enable the principal contractor to perform; and their performance by the subcontractor does not in itself discharge the principal contractor's duty to the owner with whom he has contracted. The installation of plumbing fixtures or the construction of cement floors by a subcontractor is not a discharge of the principal contractor's duty to the owner to deliver a finished building containing those items; and if after their installation the undelivered building is destroyed by fire, the principal contractor must replace them for the owner, even though he must pay the subcontractor in full and has no right that the latter shall replace them. It seems, therefore, that the owner has no right against the subcontractor, in the absence of clear words to the contrary. The owner is neither a creditor beneficiary nor a donee beneficiary; the benefit that he receives from performance must be regarded as merely incidental.

A contractor entered into a contract with the Government, the latter promising to pay the cost plus a fixed fee and assenting to the letting of subcontracts. In such a case it is clear, in the absence of evidence of a different intention, that the subcontractor is not a beneficiary of the Government's promise to the contractor to pay the cost, even though the amount payable to the subcontractor is reckoned as part of the cost. The Government made no promise to pay anything to the subcontractors. For similar reasons, the Government is not a beneficiary of a subcontractor's promise to the contractor, even though the performance promised may enable the contractor to perform his contractual duty to the Government.

4 *Corbin on Contracts* § 779D (1951 ed.) at 46, 47.

These typical construction relationships are also recognized in Delaware law. In *Cannon* the Delaware Supreme Court referred to the "buffer zone" which a general contract creates between the owner and a subcontractor, although in that case it found that the language of the subcontract evidenced an intent to extinguish the buffer zone. 336 A.2d at 216.

There is nothing to prevent a departure from the typical pattern, and, as was the case in *Cannon*, a contractor and subcontractor may agree to confer upon an owner rights which are enforceable directly against the subcontractor. However, an intent to do so must be found in the contract documents. Thus in the present case it must be determined whether the Gilbane–Pierce subcontract evidences an intent on the part of both Pierce and Gilbane to depart from the typical owner-general contractor and general contractor-subcontractor relationships to confer upon Nemours a direct right of action against Pierce.

The overall structure of the contractual relationships in this case falls into the traditional mold. Nemours as owner entered into a general contract with Gilbane. Gilbane's obligations were assured by a performance bond issued by Aetna. Gilbane entered into a number of subcontracts, including the one with Pierce. Each subcontractor's obligations were assured by a performance bond, a performance bond issued by Federal in the case of Pierce. If indeed Gilbane intended that the subcontract create an obligation running directly from Pierce to Nemours, it is curious that it accepted (in fact, prescribed) a performance bond which provided that no right of action would accrue on it to or for the use of any person other than Gilbane.

The language of the Gilbane–Pierce subcontract suggests that Gilbane and Pierce contemplated that Pierce was to be obligated to Gilbane, not to Nemours.

The subcontract is between Pierce, as subcontractor, and Gilbane as the contractor. Section 6 specified Gilbane as the entity to which Pierce was to be responsible: "The *Subcontractor* agrees to be bound to the *Contractor* by the terms and

conditions of the Agreement ... and to assume toward the *Contractor* all the obligations and responsibilities that the *Contractor,* by these documents, assumes toward the *Owner."* (Emphasis added.)

Section 7(f) of the subcontract provides that if Pierce fails to perform, Gilbane may provide labor, equipment or materials or may terminate Pierce and complete the work itself. Section 38E of the Special conditions provides that the *subcontractor's* payment and performance bond shall name *Gilbane* as obligee.

Exhibit A to the general contract, which of course is evidence of Gilbane's intent, provides that "[t]he *Contractor* shall have *sole* and *total responsibility* for completing the [general] contract ... and is responsible to the *Owner* for the full, proper, and timely performance of all work under the contract." (Emphasis added.) Article 4.3.2 of the General Conditions provides that "[t]he *Contractor* shall be responsible to the *Owner* for the acts and omissions of his employees, *Subcontractors* and their agents and employees...." (Emphasis added.)

Of significance is the incorporation of the standard AIA General Conditions of the Contract for Construction into both the general contract and the subcontract. Article 1.1.2 of the General Conditions provides:

> Nothing contained in the Contract Documents shall create any contractual relationship between the Owner or the Architect and any Subcontractor or Sub-subcontractor.

Nemours urges that in light of the definition of "Contract Documents" in Article 1.1.1, the Article 1.1.2 language serves only to preclude the general contract from creating a contractual relationship between Nemours as owner and Pierce as subcontractor but does not preclude the subcontract from creating such a relationship. Article 1.1.2 provides that "[n]othing contained in the *Contract Documents* shall create any contractual relationship between the Owner ... and any Subcontractor...." (Emphasis added.) As defined in Article 1.1.1, however, "Contract Documents" does

not include the subcontract and, therefore, Nemours argues, there is no prohibition against the subcontract creating a third party beneficiary relationship between Nemours and Pierce.

If the Article 1.1.2 language appeared only in the general contract, Nemours' argument might be persuasive. However, there was repeated incorporation of the General Conditions and its Article 1.1.2 language into the subcontract.

At page 1A of the subcontract it is provided that all work thereunder shall be in accordance with "General Conditions of the Contract for Construction, in (sic) Specifications, (AIA Document A201—1976 Edition)". In Section 6, referred to above, Pierce as subcontractor agrees to be bound by the General Contract and the General Conditions for Construction. Section 7(g) provides that "[t]he Terms and Provisions herein contained and the General Conditions For Construction (AIA Document A201—1976 Edition) ... shall supersede all previous communications, representations, or agreements, either oral or written, between the parties hereto with respect to the subject matter hereof."

This repeated incorporation of the General Conditions and its Article 1.1.2 no contractual relationship language is a strong indication of an intent on Gilbane's and Pierce's part to maintain the separate owner-general contractor and general contractor-subcontractor relationships.

No Delaware court appears to have construed general contracts or subcontracts which contain Article 1.1.2 of the AIA General Conditions or comparable language. Decisions in other jurisdictions, however, have held that this provision (or like language) prevents an owner from maintaining a breach of contract action against a subcontractor on a third party beneficiary theory, or prevents a subcontractor from maintaining a breach of contract action against an owner on such a theory. Thus the buffer is preserved by Article 1.1.2 or its equivalent. *E.C. Ernst, Inc. v. Manhattan Constr. Co. of Texas,* 551 F.2d 1026 (5th Cir.1977), *cert. denied,* 434 U.S. 1067, 98 S.Ct. 1246, 55 L.Ed.2d 769 (1978) (sub-

contractor asserted it was a third party beneficiary under the general contract); *Honey v. George Hyman Construction Co.*, 63 F.R.D. 443 (D.D.C.1974) (insurer subrogated to rights of owner asserted it was a third party beneficiary of the subcontract between the general contractor and the subcontractor); *Federal Mogul Corp. v. Universal Constr. Co.*, 376 So.2d 716 (Ala.Civ.App.1979), *cert. denied*, 376 So.2d 726 (Ala.1979) (owner sought to recover from a subcontractor on a third party beneficiary theory).

In *Honey* the general contract included a General Condition which provided that "[n]othing contained in the specifications or drawings shall be construed as creating any contractual relationship between any subcontractor and the Owner." The General Condition did not specifically preclude a subcontract from creating a contractual relationship between owner and subcontractor, but the court held nevertheless that incorporation of the General Condition by reference in the subcontract "clearly indicates that [the subcontractor] intended to avoid any contractual obligation to [the owner]." 63 F.R.D. at 450.

Similarly in *Federal Mogul Corp.* the general contract included a General Condition of the Contract for Construction which provided that "[n]othing contained in the contract documents shall create any contractual relation between any subcontractors and the owners." Here too the General Condition did not specifically preclude a subcontract from creating a contractual relationship between owner and subcontractor, but again the court held that by virtue of its incorporation in the subcontract "the language of the instant documents expressly pre-empts the creation of third party contract rights in [the owner]." 376 So.2d at 724. *See also* dicta in *G & P Electric Co. v. Dumont Construction Co.*, 194 Cal. App.2d 868, 15 Cal.Rptr. 757, 763 (1961).

Nemours' principal argument in support of its third party beneficiary theory is that the Gilbane–Pierce subcontract contains numerous provisions which evidence an intent that Nemours be benefited by Pierce's performance. The description of Pierce's work in Section 1 provides that it shall be subject to the supervision and satisfaction of the contractor and the owner. There are a number of other provisions which impose obligations on Pierce vis-a-vis Nemours, such as an obligation to furnish Shop Drawings, Erection Drawings, etc. for Nemours' approval, the requirement that Pierce indemnify and save harmless Nemours from any expense, liability or loss arising from patent, copyright or trademark infringement.

In every construction subcontract the owner is the one which ultimately benefits from its performance. However, this does not create a third party beneficiary relationship.

Nemours relies heavily on *Oliver B. Cannon & Sons, Inc. v. Dorr–Oliver, Inc.*, *supra*, in which the court held that in the circumstances of that case the various provisions of the subcontract benefiting the owner demonstrated an intent by the parties to the subcontract that the owner be a third party beneficiary of the subcontract. The result in that case turned on the ascertainment of the parties' intent. What distinguishes the present case from *Cannon* is Pierce's and Gilbane's expressed intent that there be no third party beneficiary relationship between Pierce and Nemours. For the same reason *Sears, Roebuck and Co. v. Jardel Co.*, 421 F.2d 1048 (3d Cir. 1970) (applying Pennsylvania substantive law) is inapplicable.

Until the execution of the settlement agreement between Nemours and Gilbane, the actions of all three parties affirmed the absence of a contractual relationship between subcontractor and owner. In its September 9, 1980 letter to Gilbane approving the Gilbane–Pierce subcontract, Nemours wrote "nothing herein shall be deemed or construed to create any contractual relationship between The Nemours Foundation and said subcontractor [Pierce]." During the period when disputes about performance of the contract had developed Nemours looked to Gilbane and Gilbane alone with respect to completion of Pierce's work under the subcontract. The manner in which the contract litigation was instituted

and initially prosecuted and defended evidenced the understanding of Nemours, Gilbane and Pierce that no contractual relationship existed between Nemours and Pierce.

We conclude that the subcontract does not manifest an intent by Pierce and Gilbane to confer third party beneficiary status upon Nemours. In fact, the subcontract evidences an intent to preclude such a status. Nemours and Gilbane were but two of three parties in a relationship carefully structured by contract (the general contract and the subcontract). Pierce was the third party in that relationship. By means of the settlement agreement Nemours and Gilbane, in effect, sought to change that relationship to give Nemours a previously non-existent direct cause of action against Pierce. Without Pierce's participation that was not possible. Contractual rights cannot be so casually disregarded.

Thus to the extent that the judgment of the trial court rests upon Nemours' third party beneficiary claim it must be reversed.

### IV. *Negligence Claim*

■ Nemours sued Pierce on a negligence theory as well as on a third party beneficiary theory. The trial court instructed the jury that "If you find that Pierce was negligent and that its negligence was the proximate cause of the damages allegedly sustained by Nemours, you should award Nemours an amount that will fairly and adequately compensate it for such damage." Negligence was defined for the jury as Pierce's breach of "its duties to perform its work on the hospital project in a reasonable, careful and workmanlike manner" by ten specified acts or failures to act, such as failing to supply necessary manpower, failing to perform work in a careful and workmanlike manner, failing to submit necessary documentation, failing to properly schedule work, etc. The jury was told that the elements of damages on the negligence claim were (i) the cost of correcting or replacing alleged defective or non-conforming work installed by Pierce, (ii) the cost of completing the work left

incomplete by Pierce, (iii) the extra cost of construction paid to other subcontractors as a result of the alleged breaches of contract by Pierce, and (iv) the cost of obtaining as-built drawings of Pierce's subcontract work. The jury found against Pierce on Nemours' negligence claim and the judgment awarded Nemours the same sum on account of both its contract and negligence claims—$13,040,910 plus pre-judgment and post-judgment interest.

On appeal Pierce contends that the trial court erred in failing to dismiss Nemours' negligence claim and allowing it to go to the jury. Pierce contends that under Delaware law, absent privity of contract, a party may not maintain a cause of action sounding in negligence to recover for purely economic loss, citing as authority the Delaware Superior Court case of *Crowell Corp. v. Topkis Construction Co.*, 280 A.2d 730 (Del.Super.1971).

Nemours asserts that this issue has been raised for the first time on appeal. That is clearly not correct. Like the contentions of other parties in this case, Pierce's legal contentions have shifted from time to time, depending on the exigencies of the moment. However, Pierce raised the negligence issue in its March 1984 motion to dismiss the negligence claim, and it preserved the issue as a defense in the Final Pretrial order.

In 1985 in the context, perhaps ironically, of Nemours' motion to dismiss Pierce's counterclaim based on negligence the district court concluded that the Delaware Supreme Court would probably not follow *Crowell* and would "abandon privity as a prerequisite to bringing suit on a negligence theory to recover financial losses suffered in the construction context." *Gilbane Bldg. Co. v. Nemours Foundation*, 606 F.Supp. 995, 1005 (D.Del.1985). There have been significant developments in the law on this issue since the date of the *Gilbane* decision, and we arrive at a different conclusion from that of the district court.

No party in the present case disputes that Nemours' losses are purely economic and do not involve property damage or

personal injury. It is necessary to decide whether the Delaware Supreme Court would follow the *Crowell* ruling that absent privity of contract a party may not recover in negligence for economic loss. Review on this issue is plenary.

Our role in this case is predictive. We must accord proper regard to decisions of intermediate state courts, but they are not conclusive. *Aloe Coal Co. v. Clark Equipment Co.*, 816 F.2d 110, 118 (3d Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 156, 98 L.Ed.2d 111 (1987).

In *Crowell,* decided in 1971, the owner of a building brought suit against an architect, a general contractor, and various subcontractors for damages arising from alleged construction defects in the building. The owner had no direct contractual relationship with the subcontractors, but sued them in tort "on allegations that they negligently breached the provisions of their contract with the general contractor and failed to do a workmanlike job thereby creating a defective building which was dangerous." The owner did not claim that the alleged negligence caused any accident, collapse or personal injury. Instead, the only damages the owner sought were its costs to correct the alleged construction defects.

Judge (now Chief Justice) Christie granted the subcontractors' motions for summary judgment, holding that "[t]he great weight of authority does not yet permit tort recovery under the circumstances here present in the absence of physical injury to a person or dramatic incident such as accident, collapse or explosion." *Id.* at 732. The court agreed with the subcontractors' contention that the owner should look to the general contractor for recovery of its alleged pecuniary loss. *Id.* at 731.

After *Crowell,* but still in the 1970's, two Delaware Supreme Court decisions in the construction setting allowed recovery of losses on a negligence theory. *Oliver B. Cannon & Son, Inc. v. Dorr–Oliver, Inc.,* 336 A.2d 211 (Del.1975); *Seiler v. Levitz Furniture Co.,* 367 A.2d 999 (Del.1976). Both of those cases, however, involved (i) property damage, not merely economic loss

and (ii) privity of contract between the injured party and the wrongdoer.

In *Oliver B. Cannon & Sons, Inc. v. Dorr–Oliver, Inc., supra,* the Delaware Supreme Court held that the owner (Barcroft) was a third party beneficiary of the subcontract, thus making that case clearly distinguishable from *Crowell:*

> The decision as to Barcroft's status and its privity of contract obviates the need to consider arguments of the parties relating to *Crowell Corporation v. Topkis Construction Co.,* Del.Super., 280 A.2d 730 (1971). In ruling against the maintenance of a tort action there, the *Crowell* court found no contractual relationship between owner and subcontractor.

336 A.2d at 216 n. 6. Moreover, the trial court opinion in *Oliver B. Cannon* emphasized that "[t]his is a case of *physical injury to property and not mere economic loss.*" 312 A.2d 322, 329 (Del.1973). (Emphasis added.)

Similarly, in *Seiler v. Levitz Furniture Co., supra,* the Delaware Supreme Court allowed a recovery in negligence by a shopping center tenant against an architect because the tenant's store suffered property damage during two major floods (367 A.2d at 1003–4), and also because the architect was liable to the tenant "under third-party beneficiary principles." *Id.* at 1007.

Recent developments in the law suggest a trend to preclude the maintenance of a negligence action to recover purely economic loss. In *East River S.S. Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986), the Supreme Court held that "whether stated in negligence or strict liability, no products-liability claim lies in admiralty when the only injury claimed is economic loss." 476 U.S. at 876, 106 S.Ct. at 2305.

In *Aloe Coal Co.,* this court had to determine if the purchaser of industrial equipment damaged by a sudden fire could recover from the vendor on a negligence theory under Pennsylvania law. Despite the fact that two pre-*East River* decisions of a Pennsylvania intermediate appellate court might have allowed recovery in such cir-

cumstances, this court concluded that the Pennsylvania Supreme Court would follow the holding in *East River*.

We understand completely that the *East River* holding is not binding on Pennsylvania courts, because the Supreme Court's decision was based on an interpretation of federal admiralty law only. The United States Supreme Court is supreme in matters of federal law; the Pennsylvania Supreme Court is supreme in matters of Pennsylvania law. Nevertheless, we conclude that the United States Supreme Court's analysis is so persuasive that it will be followed by Pennsylvania courts.

*Id.* at 117.

There is even stronger reason to believe that the Delaware Supreme Court will follow *East River's* analysis. In *Crowell* the Delaware Superior Court's ruling foreshadowed the *East River* holding. Neither Delaware Supreme Court case which allowed recovery of economic loss in the construction setting on a negligence theory is inconsistent with the rationale of *East River*, since each involved property damage and privity of contract.

For these reasons we predict that the Delaware Supreme Court would, if the issue were raised, reaffirm the *Crowell* ruling as Delaware law. Consequently the district court in the present case erred in failing to dismiss Nemours' negligence claim and in presenting it to the jury.

### V. Consequences of Contract and Negligence Determinations

We have concluded that under Delaware law Nemours has neither a third party beneficiary claim nor a negligence claim against Pierce. As a result, paragraph 1 of the final judgment which awards Nemours $19,045,982 plus post-judgment interest against Pierce must be reversed. This determination governs the disposition of certain other issues on these appeals.

Paragraph 1 of the final judgment also awards Nemours a similar recovery against Pierce's surety, Federal. Since Federal's liability to Nemours, if any, is completely derivative of Pierce's liability, the conclusion that Pierce is not liable to Nemours on a contract or tort theory relieves Federal of liability to Nemours.[4]

The performance bond issued by Federal which named Pierce as principal and Gilbane as sole obligee provided as follows:

> No right of action shall accrue on this bond to or for the use of any person or corporation other than the Obligee named herein or the heirs, executors, administrators or successors of the Obligee.

Federal argues persuasively on this appeal that the district court erred by holding that even in the face of this language Nemours was an intended third party beneficiary of the bond with enforceable rights thereunder. *See, for example, Rush Presbyterian St. Luke's Med. Center v. Safeco Ins.,* 825 F.2d 1204 (7th Cir.1987). It would follow, Federal contends, that even if Pierce were held liable to Nemours on a third party beneficiary or negligence theory, Federal would not be liable to Nemours on the bond. However, in view of our finding with respect to Pierce's liability to Nemours, it is unnecessary to decide this issue.

Pierce and Federal contend that the jury's compensatory damage award was against the weight of the evidence and contrary to the trial court's instructions in that the award represented the exact amount which Nemours claimed for completion costs and failed to give Pierce any credit for its unpaid contract balance.

---

**4.** This conclusion is consistent with this court's opinion in *Knecht, Inc. v. United Pacific Insurance Company,* 860 F.2d 74 (3d Cir.1988). Recognizing the general rule that the liability of a surety ends with the extinguishment of the obligation of its principal, we there held that notwithstanding the non-liability of the principal to the claimant which sued on the bond in that case, the particular language "created an independent liability to claimants as defined in the bond." By way of contrast, the language of Federal's performance bond expressly limited the persons entitled to bring suit under it: "No right of action shall accrue on this bond to or for the use of any person or corporation other than the Obligee named herein [Gilbane] or the heirs, executors, administrators or successors of the Obligee."

Since the award in its entirety will be set aside, this contention need not be addressed.

During the trial Pierce offered as an expert witness its President and majority shareholder, Lewis Pierce. His expert testimony would have been directed to the issue of the reasonableness of Nemours' cost of completing the mechanical work. Nemours objected to this testimony, asserting that Mr. Pierce could not "qualify as an expert under the Federal Rules because he is so biased, so partial." The court sustained the objection on that ground, although later in the proceedings the court noted that Mr. Pierce "would not be of assistance to the trier of fact ... and any probative value would be outweighed given his position as a principal." This ruling is troublesome whether it is viewed as a holding that Mr. Pierce, because of his position as a principal, was not qualified to testify or whether it is viewed as an exercise of discretion under Evid. Rule 403. Again, in view of our previous determinations, it is not necessary to decide this question.

Paragraph 3 of the final judgment awards Nemours $1,000,000 in punitive damages against Pierce plus post-judgment interest. In view of our rulings on the liability issues, this award must be reversed.

In addition to punitive damages Paragraph 4 of the final judgment awards Nemours $1,042,311 for attorneys' fees and expert witnesses' and consultants' costs against Pierce plus post-judgment interest. Our rulings on the liability issues require that this award be reversed. Further, in a diversity case state law ordinarily governs the award of attorneys' fees. *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 259 n. 31, 95 S.Ct. 1612, 1622 n. 31, 44 L.Ed.2d 141 (1975). We discern nothing in Delaware law which would permit recovery of attorneys' fees in the circumstances of this case. *Stephenson v. Capano Development, Inc.*, 462 A.2d 1069 (Del.1983); *Casson v. Nationwide Ins. Co.*, 455 A.2d 361 (Del.Super. 1982). Even though this is a diversity case, the recovery of fees which a prevailing party pays to its expert witnesses and consultants is governed by federal law, namely, 28 U.S.C. §§ 1821 and 1920. *Dominic v. Hess Oil V.I. Corp.*, 841 F.2d 513, 517 (3d Cir.1988). The award of expert witness fees in this case was in excess of the amounts permitted by the statute.

## VI. *The Indemnity Claim*

Under the March 1985 settlement between Nemours and Gilbane, Nemours, in addition to other undertakings, agreed to pay Gilbane the sum of $3,375,000. Using this money in addition to settlement funds received from the architect and the engineer, Gilbane then paid the aggregate sum of $3.669 million to settle the delay claims asserted by Dynalectric, Honeywell and other subcontractors. After these payments were received the subcontractors dismissed their claims against Gilbane and their cross-claims against Nemours. In its amended complaint filed following consolidation, Nemours sought indemnification from Pierce for the monies it paid to Gilbane and the jury ultimately awarded it the full settlement sum plus $1,554,118 in prejudgment interest.

The parties dispute the precise purpose of the settlement payments Nemours made to Gilbane. Pierce claims that the money was paid to settle the subcontractors' delay claims against Nemours. Nemours claims that if the payment did not reflect direct liability to the subcontractors, it reflected Nemours' liability to Gilbane for the subcontractors' claims against the latter.[5] Un-

---

5. The record clearly supports Pierce's position that at trial Nemours pursued its indemnity claim on the theory that it was potentially liable to the subcontractors (not to Gilbane) as a result of delays allegedly caused by Pierce. For example, the court's charge to the jury on the Nemours indemnity claim was as follows:

If two parties are liable to a third party for the same harm, and one of these pays the third party the full amount of the damages, then that party may claim indemnity against the other party. In an indemnity action, the party that paid the damages claims that the other party was liable for the injuries to the third party, and is required to reimburse the paying party for the full amount of the damages that were paid to the third party. In this case the owner, Nemours, is claiming indem-

der either rationale, however, the claim for indemnity is legally insufficient and must therefore be reversed. Our review of this issue is plenary.

A right to indemnity may arise through a contractual agreement, express or implied. *See Oliver B. Cannon & Son, Inc. v. Dorr-Oliver, Inc.*, 394 A.2d 1160, 1165 (Del.1978) (express right of indemnity); *Diamond State Telephone Co. v. University of Del.*, 269 A.2d 52, 56–59 (Del.1970) (express and implied rights of indemnity). When required by the equities of a given situation, some courts will also imply a right of indemnity wholly independent of any contractual relationship. *Diamond State, supra*, 269 A.2d at 56; *Cumberbatch v. Board of Trustees*, 382 A.2d 1383, 1389 (Del.Super. 1978).[6]

It is not readily apparent under which theory of indemnity Nemours' claim was presented to the jury. This is clearly not a case where there was an explicit indemnity provision in the contractual agreements between Nemours and Gilbane or Gilbane and any of the various subcontractors. If a right of indemnity exists, therefore, it must be implied in contract or in equity.

The Delaware courts stand ready, in the proper case, to imply a contractual duty of due care and a concomitant promise of indemnification upon third-party contractors or third-party employers when owners or manufacturers seek indemnity from them after the owners or manufacturers have been sued by injured employees. *See Diamond State, supra*, 269 A.2d at 56–57; *Howard, Needles, Tammen & Bergendoff*

*v. Steers, Perini & Pomeroy*, 312 A.2d 621, 623 (Del.1973); *SW (Delaware), Inc. v. American Consumers Indus., Inc.*, 450 A.2d 887 (Del.1982). This use of implied contracts permits indemnity where it would not otherwise be available because of the exclusivity of the worker's compensation remedy.

It is somewhat unclear whether Delaware would apply this theory of indemnity by implied contract to a case that does not involve the possible injustice of the worker's compensation bar. Even if the Delaware courts were to expand the doctrine, an implied contract could not be found here.

Nemours claims that it is entitled to indemnification on two possible grounds. Nemours claims first, in essence, that since it was required to indemnify Gilbane for the claims brought against Gilbane by the subcontractors for the delays caused by Pierce, it is entitled to indemnification by Pierce. Alternatively, Nemours claims that it is entitled to indemnity against Pierce for the claims brought directly against Nemours by the subcontractors for Pierce's delays.

■ Both of these theories assume that Nemours is responsible, ultimately, for Pierce's breach of contract and require the implication of a duty and promise of indemnity running directly from Pierce to Nemours. For the reasons discussed below, Nemours is not liable to Gilbane or to the subcontractors directly, for the claims asserted by the subcontractors for the delays

---

nity against a subcontractor, Pierce, for the full amount of the damages *paid through the general contractor, Gilbane, to the other subcontractors* on the Hospital project.

To recover on a claim of indemnity, Nemours must prove by a preponderance of the evidence the following:

One, that subcontractors other than Pierce actually incurred the damages for which Pierce paid.

*Two, that Nemours was legally liable to other subcontractors for the damages they incurred. Three, that Nemours had a duty to pay the other subcontractors' damages.*

Four, that the active conduct of Pierce caused the damages to the other subcontractors.

Five, that no active conduct or wrongdoing by Nemours contributed to the damages to the other subcontractors.

Six, that Pierce was under a legal duty to Nemours to indemnify it for the amounts paid to other subcontractors.

And, lastly, that the amount paid to the other subcontractors was reasonable.

(Emphasis added.)

6. Under Delaware law, a right to contribution (and not indemnity) exists between joint tortfeasors. *Diamond State, supra*, 269 A.2d at 56. As the discussion in Section IV, *supra*, demonstrates, Nemours could not be liable to either Gilbane or any of the subcontractors in tort because Delaware would not recognize a tort claim for mere economic loss.

caused by Pierce. Even if it were, however, it is clear that there can be no implied contract between Nemours and Pierce that would require the latter to indemnify the former. As we concluded above, Nemours is not a third-party beneficiary of the Gilbane–Pierce subcontract. And, as the inclusion by reference in the latter agreement of Article 1.1.2 of the Nemours–Gilbane contract makes clear, no contractual relationship whatever was intended between Pierce and Nemours. To imply what was expressly precluded would contort the plain meaning of the contract's language and subvert the intent of the parties.

Section 7(e) of the Gilbane–Pierce subcontract provides that Pierce will "indemnify and save harmless" Nemours from any expenses, liabilities or losses arising from patent, copyright or trademark infringement. Obviously, this provision does not apply in the present factual context. In a similar situation, moreover, the Delaware Supreme Court ruled that a limited indemnity agreement between two parties could not be expanded by implication to indemnify a third-party. In *Howard, Needles, supra,* a contractor attempted to use the indemnity provisions between the owner and another contractor to secure indemnity from the latter. The court wrote that "when the parties to a contract have entered into a written agreement, expressly setting forth one party's indemnity liability, there is no room for any enlargement of that obligation by implication." *Howard, Needles, supra,* 312 A.2d at 624.

■ If there is no implied contractual right of indemnity, it must be determined whether Nemours may have an implied equitable right of indemnity. Although no Delaware case has applied it, Delaware courts do apparently recognize implied equitable indemnification. *Diamond State, supra,* 269 A.2d at 56; *Cumberbatch, supra,* 382 A.2d at 1389. This doctrine, however, has been exclusively associated with Restatement of Restitution section 95 relating to "person[s] responsible for a dangerous condition," not a theory of liability applicable in the present case.

Courts in other jurisdictions have applied a more expansive doctrine which essentially dispenses with the need to show an express or implied contractual promise of indemnity when the equities of a given situation require it. As the frequently invoked maxim that equitable indemnity is not available to a "volunteer" demonstrates, however, there is a requirement that the payor have some actual or potential liability for the obligation it discharges on another's behalf. *E.g., Aetna Life & Cas. Co. v. Ford Motor Co.,* 50 Cal.App.3d 49, 122 Cal.Rptr. 852, 854 (1975), Restatement of Restitution sections 76, 112 (1937). Some cases, pushing the doctrine even further, require only a "reasonable good faith belief" that the payor was "protecting his own interests" when he made the payment. *Hydro–Air Equip., Inc. v. Hyatt Corp.,* 852 F.2d 403, 407 (9th Cir.1988).

It is difficult to divine whether the Delaware Supreme Court would countenance an expansion of its relatively limited version of the doctrine. If it did, however, its brief discussion of the doctrine indicates that it would probably limit its availability to a payor who is "jointly liable" with the indemnitee. *See Diamond State, supra,* 269 A.2d at 56.

Assuming without deciding that Delaware might apply an expanded doctrine, Nemours could not benefit from it because Nemours is simply not liable to the other subcontractors or to Gilbane for the delays caused by Pierce. Article 4.3.2 of the Nemours–Gilbane contract demonstrates that Nemours did not intend to indemnify Gilbane or otherwise accept liability for the claims brought by subcontractors against Gilbane for another subcontractor's breach of its contract with Gilbane. That provision states that "[t]he contractor shall be responsible to the owner for the acts and omissions of his employees, subcontractors and their agents and their employees ..." To imply that Gilbane had a right of indemnity against Nemours or that Nemours was otherwise responsible for the claims brought against Gilbane for Pierce's delays would invert this language.

It is also clear that the subcontractors are not third-party beneficiaries of the Nemours–Gilbane contract since they are incidental and not intended beneficiaries. As discussed in Section III, *supra*, Article 1.1.2 of the General Conditions provides that "[n]othing contained in the Contract Documents shall create *any contractual relationship* between the Owner and the Architect or any Subcontractor or Sub-subcontractor." (Emphasis added.) The subcontractors could not, therefore, claim against Nemours for Pierce's delay.

When Nemours settled the claims for Pierce's delay, whether with Gilbane or directly with the other subcontractors, it acted as a mere volunteer insofar as the subcontractors' claims were concerned. The subcontractors could not maintain an action against Nemours and Nemours was not liable to Gilbane for Pierce's delays. The proper route was for the subcontractors to seek damages from Gilbane which could then seek damages of Pierce.

For these reasons, therefore, that portion of the judgment reflecting Nemours indemnity claim against Pierce, along with interest, is reversed.

## VII. *Gilbane's Contract Claim*

Gilbane asserted a claim against Pierce for breach of contract and a parallel claim against Federal on Federal's bond securing Pierce's performance of its work under the subcontract. Gilbane's breach of contract claim has two elements—(i) liquidated damages for delay in the amount of $3,000 for each day of delay from March 23, 1983 through December 4, 1984, for a period of 625 days resulting in a total liquidated damages claim of $1,875,000 and (ii) back charges for clean-up, hoisting and miscellaneous items in the amount of $269,699. The jury returned a verdict of $2,066,699 on the combined claim and judgment was entered in that amount plus $951,671 in pre-judgment interest plus post-judgment interest. Of necessity the major portion of the award represented liquidated damages.

Pierce and Federal challenge the liquidated delay damages award on the ground that the provision for liquidated damages created a "pass through" obligation, triggered only if Gilbane became obligated to Nemours under a similar provision in the general contract. Since Gilbane was never required to pay delay damages (or, in fact, any damages) to Nemours, Pierce and Federal contend that Pierce is not required to pay delay damages to Gilbane.

Once again it is necessary to turn to the applicable contracts.

Article 4.1 of the general contract between Nemours and Gilbane provided:

The work to be performed under this Contract shall be commenced within five (5) days of the effective date of the Architect's notice to proceed and, subject to authorized adjustments, Substantial Completion shall be achieved not later than September 15, 1982.

It is expressly agreed and understood that time is of the essence in this agreement and if the contractor fails to complete the work on or before the above specified date, or any extension thereof, authorized in writing by the Owner, the actual damages to the Owner due to such delay will be difficult or impossible to determine. Contractor therefore agrees to pay, in lieu of actual damages and not as a penalty, the sum of $3,000 for each and every calendar day of delay, which constitutes fixed, agreed and liquidated damages. The Owner may at its option deduct said sums from monies due the Contractor. Contractor will not be charged with liquidated damages for delays excused by the Owner pursuant to the terms of paragraph A–3 of Exhibit A.

Paragraph 14 of the subsequently executed Gilbane–Pierce subcontract contained a liquidated damages provision which provided:

Since time is of essence in this project, and since it is difficult to determine the exact damage that *the Owner* will sustain by a delay in performance, it shall be agreed that in case of failure on the part of the Subcontractor to complete the work within the time fixed in the Contract by milestones or any extension thereof, the Subcontractor shall agree to pay to the General Contractor liquidated

damages, *a maximum sum* of $3,000 for each calendar day of delay in the completion of work. It shall be understood and agreed that the General Contractor may, at his sole determination, make a pro-rata assessment of the maximum liquidated damages for each Subcontractor. (Emphasis added.)

■ We reject at the outset Pierce's and Federal's contention that since Gilbane has failed to establish actual damages caused by the delay in completion, paragraph 14 of the Gilbane–Pierce subcontract constitutes an unenforceable penalty provision. "The general rule in Delaware is that an enforceable liquidated damages provision is distinguishable from a penalty where two criteria are found to exist. First, the damages which the parties might reasonably anticipate to result from a breach must be difficult or impossible to prove accurately and second, the agreed upon sum must be reasonable." *Piccotti's Restaurant v. Gracie's, Inc.,* 1988 Del.Super. LEXIS 48, at 3 [1988 WL 15338 at 1] (Del.Super.1988). It can hardly be disputed that delay damages in the complex construction context of this case would be difficult or impossible to prove accurately. Given the amount of money and the extent of the work involved in the Nemours–Gilbane contract and in the Gilbane–Pierce subcontract, it cannot be said that $3,000 per day liquidated damages bears an unreasonable relation to the damages that might be expected to result from a breach.

Under Delaware law it is a defendant's burden to demonstrate unreasonableness, and the district court in this case could appropriately have concluded that Pierce and Federal failed to sustain that burden. Further, contrary to Pierce's and Federal's contentions, under Delaware law damages are recoverable under a valid liquidated damages provision even though no actual damages are proven as a consequence of that breach. *Piccotti's, supra,* at 4 [1988 WL 15338 at 2].

■ A more difficult question in the present case is whether the liquidated damages clauses in the general contract and in the subcontract must be read in tandem, with the latter becoming operative only if liquidated damages are recovered under the former.

As noted above the Nemours–Gilbane general contract recited that "actual damages to the *Owner* [Nemours] due to ... delay will be difficult or impossible to determine" and provided for liquidated damages in the amount of $3,000 per day of delay.

The language of the Gilbane–Pierce subcontract was somewhat different in nature. It did not provide that actual damages to *Gilbane* would be difficult or impossible to determine. Rather, it provided that "it is difficult to determine the exact damage that the *Owner* [Nemours] will sustain by a delay in performance." Further, the Gilbane–Pierce subcontract did not provide for fixed liquidated damages of $3,000 per day. Rather, it provided for liquidated damages in "a *maximum* sum of $3,000 for each calendar day of delay in the completion of work."

Thus, standing alone the provision in the subcontract is not really a true liquidated damages clause. It refers to the difficulty of establishing the damages of a non-party to the subcontract (Nemours), which will not be claiming damages under the subcontract, and it does not establish a fixed amount as liquidated damages, only a maximum amount. To establish the actual amount of liquidated damages under the subcontract reference must of necessity be made to something else.

The subcontract liquidated damages provision makes sense only if it is construed, as Pierce and Federal contend, as a pass-through obligation, providing that in the event a subcontractor caused delay in completing the project Nemours could collect $3,000 per day from Gilbane, which in turn could pass-through that obligation to the subcontractor. Read in this light, the subcontract's statement that it is difficult to ascertain the exact damage to the "Owner" makes sense. Similarly the amount of liquidated damages can be ascertained, namely the amount which Nemours, the Owner, recovered against Gilbane. Since there was a $3,000 per day amount which Nem-

ours could recover, Gilbane was fully protected by the $3,000 ceiling in the subcontract. This view of the meaning of the liquidated damages provision in the subcontract is consistent with the court's conclusion in *United States v. Henke Constr. Co.,* 157 F.2d 13 (8th Cir.1946).

In the present case Gilbane paid nothing to Nemours as liquidated damages. In fact Nemours and its architect and engineer paid $4,025,000 to Gilbane under the settlement agreement, a sum which Gilbane distributed among its subcontractors (other than Pierce) and itself. In these circumstances Gilbane was not entitled to recover delay damages. It can reasonably be assumed that in the jury's award to Gilbane of $2,066,699 there was included the sum of $269,699 representing Gilbane's claim under the subcontract for back charges. To that extent paragraph 5 of the final judgment will be affirmed. The balance of the award contained in paragraph 5 representing liquidated delay damages must be reversed.

### VIII. *Interest Rulings*

The appeals raise questions concerning interest to be paid on the judgment: (i) whether all pre-judgment interest should be computed from April 18, 1983, the date when the jury found that Pierce breached its subcontract, (ii) whether post-judgment interest is payable on pre-judgment interest, and (iii) whether post-judgment interest should have been reduced from 10½% to 5.63%.

These questions are academic with respect to most of the awards contained in the final judgment. However, the award on account of Gilbane's claim for back charges survives and therefore the interest questions must be addressed.

■ A. *Date for computing pre-judgment interest:* The trial court imposed pre-judgment interest on each award commencing on April 18, 1983, the date the jury found that Pierce breached its subcontract. Gilbane contends that under Delaware law in a contract case interest accrues from the date of the breach. *Superior Tube Co. v. Delaware Aircraft Industries, Inc.,* 60

F.Supp. 573 (D.Del.1945), and that, therefore, the April 18, 1983 date was the correct date from which to compute pre-judgment interest.

We conclude otherwise and hold that Delaware law requires that pre-judgment interest be computed from the date of loss, which may or may not be the date of the breach of the contract. *Getty Oil Co. v. Catalytic, Inc.,* 509 A.2d 1123, 1128 (Del. Super.1986); *see also* the admiralty case, *Slater v. Texaco, Inc.,* 506 F.Supp. 1099 (D.Del.1981). The case will, therefore, be remanded so that the district court can determine the appropriate date from which pre-judgment interest should run on the award in favor of Gilbane in the amount of $269,699.

B. *Post-judgment interest on pre-judgment interest:* Pierce and Federal urge that it was error for the district court to award post-judgment interest on the pre-judgment interest awarded to Nemours and Gilbane. This contention is academic insofar as it relates to the awards in favor of Nemours. It may be correct as a matter of law insofar as it relates to the award in favor of Gilbane. *Summa Corp. v. Trans World Airlines, Inc.,* 540 A.2d 403, 410 (Del.1988). However, we conclude that the district court correctly refused to grant Pierce's and Federal's motion for relief from the interest award because it was filed too late.

More than a year and a half after judgment was entered in this case Pierce and Federal filed a motion for relief from the award of so-called "compound interest". The district court denied the motion on the grounds that (i) it did not have jurisdiction because the case was pending before this court, (ii) the motion was not properly brought under Rule 60(a) as it did not involve a clerical error, and (iii) it was untimely under Rule 60(b)(1) as it was not filed within one year from the date of final judgment.

The motion was clearly untimely and Pierce and Federal advanced no sound reason in the district court why the court should exercise its discretion to relieve

them from the final judgment's provisions imposing post-judgment interest on pre-judgment interest. Consequently the district court's order will be affirmed.

C. *Reduction of post-judgment interest rate:* Apparently unaware of the effect of 28 U.S.C. § 1961 concerning post-judgment interest on federal court judgments, Pierce and Federal agreed to inclusion in the final judgment of a 10½% post-judgment interest rate. On September 14, 1987, 364 days after entry of the final judgment, they moved pursuant to Fed.R. Civ.P. 60(b)(1) and 60(b)(6) seeking to have the district court change the post-judgment interest rate. Ultimately the district court granted the motion, reducing the post-judgment interest rate from 10½% to 5.63%.

The matter is governed by 28 U.S.C. § 1961 notwithstanding that this is a diversity action. Nemours and Gilbane appeal the district court's order granting Pierce's and Federal's motion on the ground that it was not timely brought.

■ A motion for relief under Rule 60(b) is directed to the sound discretion of the trial court. *Giordano v. McCartney,* 385 F.2d 154, 155 (3d Cir.1967). We do not find that the district court abused its discretion by entertaining the motion in the circumstances of this case. It is a particularly complex matter. The final judgment was entered with considerable haste after the jury verdict, and at the time the Rule 60(b) motion was filed the district court still had not ruled on Pierce's and Federal's motions for new trial and for judgment notwithstanding the verdict.

A Rule 60(b)(1) motion must be filed within a reasonable time and in any event not more than one year after the judgment was entered. We cannot say that the district court abused its discretion when it found that the motion was filed within a reasonable time and considered it on the merits. For that reason the order granting the motion will be affirmed.

IX. *Conclusion*

Paragraph 1 of the final judgment which awards Nemours damages and interest against Pierce and Federal for Pierce's negligence and breach of contract will be reversed.

Paragraph 2 of the final judgment which awards Nemours damages and interest against Pierce for indemnity payments will be reversed.

Paragraphs 3 and 4 of the final judgment which award Nemours, respectively, punitive damages plus interest and attorneys' fees and consultants' costs plus interest will be reversed.

Paragraph 5 of the final judgment which awards Gilbane damages and interest against Pierce and Federal for Pierce's breach of contract will be modified as follows: The amount of the recovery before interest will be $269,699.22. Post-judgment interest (including interest on pre-judgment interest) will be computed at the rate of 5.63%. On remand the district court will ascertain the proper date or dates from which pre-judgment interest shall be computed (at the rate of 13½%).

Paragraph 6 of the final judgment will be modified to provide that each party shall bear its own costs.

SLOVITER, Circuit Judge, dissenting.

I.

Although I am in agreement with a substantial portion of the majority opinion in this complex appeal, I respectfully dissent because I disagree with the conclusion that under Delaware law the owner, Nemours, could not be considered to be a third party beneficiary of the subcontract for purposes of bringing suit for damages sustained when Pierce, the subcontractor, walked off the job. The effect of the majority's decision is that while Nemours had a substantial dispute with general contractor, Gilbane, over performance and payment, which resulted in litigation, Nemours was nonetheless required either to depend on Gilbane to file and process Nemours' claim for damages against Pierce or to sue Gilbane for what the jury found was Pierce's unjustifiable refusal to perform.

As the majority recognizes, this court sitting in diversity is bound to apply Dela-

ware law. Because I believe that a fair reading of the applicable Delaware case law supports the inference that Pierce and Gilbane intended to benefit Nemours, I conclude that Nemours could maintain a third party beneficiary suit against Pierce.

The majority correctly points out that under Delaware law the right to sue on a contract as a third party beneficiary is a function of the contracting parties' intent to confer a benefit on the third party.[1] As I read Delaware case law, contractual provisions in a subcontract such as those in the Gilbane–Pierce subcontract are sufficient to permit an inference of intent to benefit the owner. *See Oliver B. Cannon & Sons, Inc. v. Dorr-Oliver, Inc.,* 336 A.2d 211, 215–16 (Del.1975); *Oliver B. Cannon & Sons, Inc. v. Dorr-Oliver, Inc.,* 312 A.2d 322 (Del.Super.Ct.1973); *see also Sears, Roebuck and Co. v. Jardel,* 421 F.2d 1048 (3d Cir.1970) (applying Pennsylvania law but cited with approval by Delaware Supreme Court in *Cannon* ).

Factors referred to in these cases as significant were that the subcontracts in question identified the owner, specified that work was to be done on the owner's premises, and contained provisions whereby the subcontractor undertook to indemnify the owner against certain losses arising out of the execution of the subcontractor's work. *Cannon,* 312 A.2d at 327–28 & nn. 4–5 (Del.Super.Ct.); *Jardel,* 421 F.2d at 1054 & nn. 18–19. Additionally the Delaware Supreme Court, in affirming the Superior Court's decision in *Cannon,* cited the existence of a warranty for defective workmanship running from the subcontractor to the owner. *Cannon,* 336 A.2d at 216 (Del.). Because the Gilbane–Pierce contract contains equivalent provisions, I believe that there was sufficient evidence under Delaware law to find that Gilbane and Pierce intended to make Nemours a beneficiary of the subcontract.

The majority declines to follow the *Cannon* courts' rationale on the grounds that there is other evidence which negates the inferences of intent which are permissible under those decisions. Majority at 539. To the extent the majority relies on evidence gleaned from sources other than the Gilbane–Pierce contract itself, such as statements by Nemours to the effect that there was no contractual relation between it and Pierce, the majority deviates from the acknowledged Delaware requirement that the intent to create a third party beneficiary must be ascertained from the language of the contract itself. *See Cannon,* 336 A.2d at 215 (Del.); *Royal Indemnity Co. v. Alexander Industries, Inc.,* 211 A.2d 919, 920 (Del.1965); *Crow v. Erectors Inc.,* 1988 Del.Super. LEXIS 18, 6 (Del.Super. 1988) [1988 WL 7617, p. 2].

The majority's conclusion that Pierce and Gilbane did not intend to benefit Nemours rests primarily on the incorporation of Article 1.1.2 of the AIA General Conditions of the Contract for Construction from the Nemours–Gilbane contract into the Gilbane–Pierce contract. That clause, which states that nothing contained in the "Contract Documents" shall create any contractual relationship between the Owner and a Subcontractor, clearly expresses Nemours' intent not to confer third party rights on *Pierce.* The "Contract Documents" as defined in the Nemours–Gilbane contract in which Article 1.1.2 is embedded do not include the Gilbane–Pierce contract; the Gilbane–Pierce contract does not expressly preclude the formation of contractual relations between Pierce and Nemours. I am willing to assume *arguendo* that the relationship established by the scheme of incorporated provisions precluded the Owner and Subcontractor from asserting contractual claims against each other arising in the ordinary course of the construction, such as claims for additional payment due or failure to follow the contract specifica-

---

1. The district court determined that Nemours was a third party beneficiary of the Gilbane–Pierce contract as a matter of law, and did not submit the issue of the parties' intent to the jury. The parties have not argued otherwise on this appeal. *But see STV Engineers, Inc. v. Greiner Engineering Inc.,* 861 F.2d 784 (3d Cir.1988) (Sloviter, dissenting) (question of the intent of contracting parties with respect to ambiguous term is issue of contract interpretation and hence a matter of fact).

tions, and required that such claims be funneled through the prime contractor. I believe, however, that Delaware would require a more explicit preclusion of Nemours' right to sue the subcontractor for total failure of performance than the mere inclusion of this standard clause in the form contract, particularly in light of the indemnity and warranty provisions in the Gilbane-Pierce contract that were designed to benefit Nemours. Therefore I would affirm the district court's ruling that this case could proceed to the jury on a third party beneficiary theory.

## II.

Because I reach this conclusion, I must also consider the propriety of the district court's exclusion of the expert testimony of Lewis Pierce, president of the company, on the reasonableness of Nemours' completion costs. In light of its disposition, the majority does not reach this issue, although it expresses its concerns with that ruling.

The district court originally sustained the objection to Pierce's testimony on the ground that Pierce was disqualified under Fed.R.Evid. 702 because of his interest in the outcome of the litigation, and thereafter stated that it would exclude Pierce's expert testimony under Fed.R.Evid. 403, on the ground that the probative value of such testimony would be outweighed by its prejudice. The rationale of the latter ruling was the same as its rationale under Rule 702, *i.e.*, that Pierce had too much motivation to lie and that the jury would attach too much weight to his testimony if he were labelled an expert.

Even under the deferential abuse of discretion standard applied to evidentiary rulings, I could not sustain the exclusion of Pierce's testimony. The district court found that Pierce was fully qualified as an expert. The Federal Rules of Evidence have greatly relaxed the standards for the admissibility of expert testimony. While the district court may have been relying on the prohibition against using witnesses who are paid on a contingent basis, *see Model Code of Professional Responsibility*, DR 7–109(C) (1980), the rule as applied

by the district court would disqualify as experts all parties and many employees of parties, a position which has no support under current principles of evidence. *See Manufacturing Research Corp. v. Graybar Electric Co.*, 679 F.2d 1355, 1366 n. 21 (11th Cir.1982); *Dunn v. Sears, Roebuck & Co.*, 639 F.2d 1171, 1174 (5th Cir.), *modified on other grounds*, 645 F.2d 511 (1981).

Pierce's possible bias was merely a matter affecting credibility and went to the weight not the admissibility of the evidence. *See Universal Athletic Sales Co. v. American Gym, Recreational & Athletic Equipment Corp.*, 546 F.2d 530, 539–40 (3d Cir.1976) (error for trial judge sitting as trier of fact to accord too much weight to testimony given by lawyer as expert witness on his client's behalf, but not error to permit lawyer to testify), *cert. denied*, 430 U.S. 984, 97 S.Ct. 1681, 52 L.Ed.2d 378 (1977).

Since Pierce was the last witness for the Company in an extremely lengthy trial, I cannot say that the exclusion did not affect the outcome of the trial. Pierce had little or no time to procure another expert, and was thus prevented from putting an important aspect of its case before the jury. The issue of completion costs was one on which expert testimony could assist the trier of fact because the court had permitted Nemours' expert to testify on that subject. The district court did permit Pierce to give lay opinion testimony under Fed.R.Evid. 701, but his opinion was limited to facts which he had actually perceived, and he was prevented from stating his opinion of the analysis of Nemours' completion costs as presented by their expert. Thus, I would view the exclusion as warranting a remand for a new trial.